Joe Kenneth RIDDLE, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13153.

Court of Criminal Appeals of Oklahoma.

July 18, 1962.

W. B. Ward, Jr., Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam A. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Presiding Judge.

Joe Kenneth Riddle, hereinafter referred to as defendant, was charged by information in the District Court of Pontotoc County. He was tried before a jury, found guilty, and sentenced to five years in the Oklahoma State Penitentiary.

Defendant lodged his appeal in this Court within the time prescribed by law, asserting 3 assignments of error. They will be discussed in the order which they appear in the brief.

 Counsel for defendant first contends that the trial court erred in overruling his Motion for Continuance. The Motion for Continuance was on the grounds that a charge arising out of the same act was pending in the Eastern District of Federal Court and the case at bar should not proceed to trial until the case in Federal Court had been disposed of. His contention is based upon 63 O.S.A. § 421, which reads as follows:

"No person shall be prosecuted for a violation of any provision of this Act if such person has been acquitted or convicted under the Federal Narcotic Laws of the same act or omission which, it is alleged, constitutes a violation of this Act."

Prior to trial, the defendant filed the following motion:

"Comes now the defendant, Joe K. Riddle, and shows the Court that he stands charged by Information duly filed in the District Court in and for Pontotoc County with the crime of 'Possession of Marijuana', this offense being governed by 63 O.S.A. § 451. Your defendant would further show the Court that he now stands charged by Indictment filed in the Federal District Court in and for the Eastern District of the State of Oklahoma at Muskogee, Oklahoma, with the crime of 'Unlawful Transfer of Marijuana', the same case being case Number 26,685 Criminal; a photostatic copy of said Indictment is marked Exhibit A and attached hereto. Your defendant would further show the District Court that he has been advised by his attorney of record in the above mentioned federal case, Mr. Paul Gotcher, Musko-

gee, Oklahoma, that said case will be tried in the Federal District Court in and for the Eastern District of the State of Oklahoma during the month of September or early October, 1961. Your defendant would further show that the instant case is set for trial in the District Court in and for Pontotoc County on September 7, 1961. Your defendant would further show that 63 O.S.A. § 421 provides as follows, to wit:

" 'No person shall be prosecuted for a violation of any provision of this Act if such person has been acquitted or convicted under the Federal Narcotic Laws of the same act or omission which, it is alleged, constitutes a violation of this Act.'

"Wherefore, since a trial on this date of the above styled and number cause would avoid and evade the intention of the Legislature as set out in 63 O.S.A. § 421, your defendant would respectfully move this Honorable Court to strike the above styled and numbered cause from this trial docket and continue it to the next jury term upon which criminal cases will be tried."

It is to be observed that the defendant was charged under the State law with "Possession of Marijuana". The Indictment returned against defendant in the Eastern District of Federal Court read as follows:

"That on or about November 16, 1960, in Pontotoc County, Eastern District of Oklahoma, Joe Kenneth Riddle transferred a quantity of approximately 37.450 grains of marijuana to Charles D. Casey, which said transfer was not made pursuant to a written order on a prescribed form as required by law."

It is to be noted that charge by the Federal Government is a different charge from "Possession of Marijuana", with which he was charged in the instant case. Though it arose out of the same transaction, he was charged with violation of a different crime.

In People v. Benenato, 77 Cal.App.2d 350, 175 P.2d 296, the California Court said:

"The same act may violate different statutes and thus constitute different offenses punishable under separate statutes and if one offense requires proof of an element different from the other they may not be deemed to constitute the same offense so as to preclude punishment for each, even though both offenses are founded chiefly on the same facts."

Also see, People v. Owens, 117 Cal.App.2d 121, 255 P.2d 114.

The Circuit Court of Appeals 9th Circuit held in Bridges v. United States, 259 F.2d 611:

"A prosecution for unlawfully selling and dispensing a narcotic drug and fraudulently concealing and facilitating the concealment of such drugs unlawfully imported into the United States involved two separate offenses authorizing consecutive sentences even though violations allegedly arose out of one transaction."

No doubt the Legislature intended that a man be tried only one time for a crime in violation of the Narcotics Act and the only way the defendant could be guaranteed this would be for the State to stay the proceedings until the case had been disposed of in Federal Court. Defendant could be acquitted in State Court and prosecuted for the same offense in Federal Court. However, if he were convicted or acquitted in Federal Court, it would be a bar to a prosecution in State Court. This statute would not be applicable in the case at bar because he is charged with different offenses.

The defendant further argues that the trial court erred in permitting a rebuttal witness to testify over the objection of defendant's counsel, in regard to the reputation of one of the State's witnesses. The arresting officer, J. D. Roberts, had been discharged from the Oklahoma City Police Department. This evidence was brought

out by the state. On cross examination he was examined at great length on the reasons for the discharge. It seems Officer Roberts had been involved in an incident while he was on the police force, where a street light was shot out and a car was fired on. Roberts contended he was discharged because he refused to make a report on the incident. After the State rested and defendant had presented his case, Roy Bergman was called as a rebuttal witness for the State, over the objections of defendant as follows:

"Q. Are you acquainted with one Cliff Roberts?

"A. I sure am.

"Q. And was Mr. Roberts ever officially employed by you or your department?

"A. Yes, sir.

"Q. Do you recall the circumstances under which that employment was terminated?

"BY MR. WARD: Just a minute, Mr. Bergman! If the Court please—

"BY THE COURT: Objection sustained. You have got him on here now as a rebuttal witness, and if you are going to prove anything by him, it would have to be something that they brought out. Well, we will let him answer that question.

"BY MR. WARD: Sir?

"BY THE COURT: We will let him answer.

"BY MR. WARD: Well, let the record show our exceptions.

"BY THE COURT: All right.

"BY MR. MACY: Would you have the Court Reporter to repeat that last question.

"(Question read by the reporter)

"A. Yes.

"Q. Would you explain what that situation was?

"A. Well, he and his partner got involved in an incident in which a street light was shot out, and under the rules of the Department, why, he was discharged.

"Q. At that time, in what capacity was Mr. Roberts employed?

"A. He was a Narcotics Officer out of the Special Services Department.

"Q. Were you acquainted with his work at that time?

"A. Very well.

"Q. Would you say that Mr. Roberts was an efficient law enforcement officer of your department?

"A. *He was, I think, one of the finest Narcotics Officers in this part of the country.*

"Q. Would you explain his working conditions prior to the time of his discharge?

"BY MR. WARD: If the Court please, again, I want to object to this as being improper rebuttal testimony. I don't see any connection, at all, with the evidence.

"BY THE COURT: I think you have gone far enough into that. Objection sustained."

■ This testimony in substance was no more than character reference vouching for the good reputation of the prosecuting officer and was improper. The Court should not have permitted the witness to testify. Roberts was presented by the State. They vouched for his truth and honesty when they put him on the witness stand. It was unnecessary and improper for the State to put on rebuttal testimony to prove the reputation of their witness. This Court said in the case of Clark v. State, Okl.Cr., 370 P.2d 46, in an opinion by Judge Brett:

"Rebuttal evidence in criminal case is that which is given by the state to explain, repel, counteract, contradict, or disprove evidence introduced by or on behalf of the *defendant.*"

■ In the instant case the evidence did not fall in any of these categories. The State adduced the evidence and brought it

to light, and the rebuttal was only a re-hash of the testimony. The Court has been consistent in the rule adapted in the case of Plumlee v. State, Okl.Cr., 361 P.2d 223, where the Court said:

"A trial court should not permit a re-hash of a witness's testimony given in chief under the guise of rebuttal. Counsel for the state have no more right to reserve the principal testimony and introduce it under the guise of re-buttal nor to rehash testimony intro-duced in chief under the guise of rebut-tal, then the accused would have to re-introduce his testimony after the state has closed the rebuttal."

The case at bar resulted in a swear-ing match between the witness Roberts for the State and the defendant. It was im-proper for the State to bolster their witness by bringing in rebuttal a witness to vouch for his reputation and character in hope that the jury would place more value on his testimony than on defendant's. If this were permitted, there would be no end to vouch-ing for the truth and veracity of each and every witness who testified. It was improp-er rebuttal and should have been excluded.

The defendant further contends that the trial court erred in overruling the defend-ant's Demurrer to the Evidence of the State and in overruling the defendant's Motion for the court to direct the jury to return a verdict of Not Guilty. In this connection, defendant argues that the evidence showed that defendant was entrapped into the com-mission of the offense by Officer Roberts, and part time employee of the Narcotics Bureau, Granville Humphrey. It shall be necessary to discuss the testimony to arrive at a fair conclusion of defendant's propo-sition number 3.

The defendant testified he was a resident of Pontotoc situated in Pontotoc County, that he was married and owned his home. That he was a rodeo performer and on No-vember 14, 1960, he was in Oklahoma City. While in "Packing Town" he visited the "Corral Bar" where he met Granville Hum-phrey who is a police character and known

to deal in barbiturates, who was working as a part time employee of the Narcotics Bureau. Defendant had known Humphrey before as his relatives lived in the same town as defendant's. Humphrey asked the defendant if he had seen this "Gene Taylor" (this was Officer Roberts' undercover name), and the defendant testified that he answered, "No, I haven't", and Humphrey said "He wants to see you, he has been hunting you". Defendant's testimony is as follows:

" 'Well, I have been off rodeoing and I haven't been around here.' And he says, 'Well, they are wanting to buy some marijuana, is what they are want-ing to do, and they don't either one know a thing about it,' and he says, 'and we can sell them a sack of weeds and "put it on them".'

"I said, 'All Right.' I said, 'If they don't know no difference between mari-juana and weeds, we will gather them a sack full of weeds', and he said, 'All right.' And so he goes to a phone and calls this 'Gene Taylor', which is Cliff Roberts, and he talked to him—I don't know what he said, because I didn't listen. But anyhow, he comes back and tells me that if we go out here to this lumber yard, he will be out. And so, we go out there and park and wait for, I guess, three or four minutes when he drives up. He gets out of his car and gets into the back seat of my car, and we shook hands and spoke. And, Humphrey reached in under his shirt and got a, oh, it looked like that it was a little old nickel candy sack, and asked 'Gene' if he wanted a cigarette, and said, 'This is a sampling of the stuff that we have got'.

"Q. Did you know that this Hum-phrey had this marijuana out there with him?

"A. No, I did not.

"Q. All right, go ahead.

"A. And Cliff Roberts said, 'Well, I would like to have some of it', and so he went and took his cigarettes out of

his cigarette package—out of his pocket, took the cigarettes out and put them in his pocket, and then had this empty cigarette package and handed it to me and said 'Put me some of that in it', and I didn't do it—I said, 'You put it in it, yourself, if you want it'. And so, he put some in this package. And we made the arrangements—he was going to pay me three hundred dollars a sack, and he wanted to know how much there would be and I told him that I didn't know, that I didn't know nothing about it, but that there might be two or three tow sacks full. And so, he agreed to pay three hundred dollars a sack. So, I didn't say no more, and so they left— Humphrey left. And, I was supposed to have met them at eight o'clock the next night out here at this Katy's Drive-In. Well, I got to thinking it over and decided that I had better not mess with it. And so I didn't go.

"Q. Did you make any effort at all to keep this appointment at Katy's the night of the 15th?

"A. No, sir, I did not."

Cliff Roberts testified he received a telephone call through member of his staff that he was to contact Mr. Riddle and Mr. Humphrey at the intersection of 25th and South May in Oklahoma City at approximately 4:30 on the afternoon of November 14, 1960. He testified as follows:

"A. I met him at the intersection there and he had his car parked near a lumber yard. I got out of my automobile and he entered the back seat of the car. *There was another man with him,* (The man was well known by Mr. Roberts and was working as a special agent for him.) and I got into the rear seat sitting behind Mr. Riddle. We exchanged greetings, and Mr. Riddle handed me a small paper bag and asked me to look at it.

"Q. Did you look at it?

"A. Yes.

"Q. Now when Mr. Riddle handed you this small bag, what did he say?

"A. He asked me if that looked like pretty good stuff. I looked at it and told him that it looked allright, and he told me to take some for a sample and that he had about 900 dollars more of the same stuff."

This is the paramount conflict in the testimony. Riddle having testified that it was Humphrey who had the stuff and handed it to Roberts.

Arrangements were made to meet Riddle the next night at Katy's Drive-In, Pontotoc County, to make the purchase. Officer Roberts and Federal Agent Charles Casey were there the next night as stated by Mr. Roberts:

"A. We arrived at Katy's Drive-In shortly after seven o'clock in the evening, and Mr. Riddle was not there, and failed to meet us. We waited for some hour or hour and a half and Mr. Riddle didn't arrive at this cafe."

The testimony reveals that Mr. Roberts and Mr. Casey then went to the home of Joe Riddle's father. Joe was living there at the time according to the testimony of Joe's father, Stanley Riddle. They arrived there after dark, he figured around eight o'clock. He testified as follows:

"Q. Then, it was after dark?

"A. Sir?

"Q. It was after dark, then?

"A. Yes, sir, it was dark.

"Q. All right. Did you see them, again, that day?

"A. Not that—Well, away up in the morning, I seen them.

"Q. At about what time was that?

"A. Well, I got up at about Four o'clock, and they drove up.

"Q. And what did they want at this time?

"A. They wanted to see Joe, again.

"Q. It was the same two fellows?

"A. Yes, sir, the same two fellows.

"Q. And was Joe at home at that time?

"A. Yes, sir.

"Q. And what did you tell them?

"A. Well, I had talked to Joe, and Joe told me to tell them that he didn't want to see them, and for them to leave, but I hated to tell the men that, and I just says, 'He is not at home'.

"Q. All right, and did you see them, again—

"A. Yes, sir.

"Q. Strike that. Did they leave?

"A. Yes, they left, and then in about, oh, at 4:30 or Five o'clock they came back, and they wanted to see him, again, and I asked them what did they want and they said that they had kind of a deal on with him and that he was losing a thousand dollars. I said to the fellows, I said, 'Now fellows, if you guys are after "Wildcat" whisky, get away from here and stay, and that there is no "wildcat" whisky on this place, or whisky of any kind'.

"Q. Did they leave?

"A. Yeah, they left.

"Q. Did you ever see them, again?

"A. No, I didn't see them no more.

"Q. Now then, who was there at this third trip that they made there?

"A. No, I wasn't there when they come—"

Joe Riddle testified that the Officers came to his Father's house and the following took place:

"Q. Okay, and did you see Mr. Roberts and Mr. Casey that night?

"A. When they came to my mother and father's house?

"Q. Yes.

"A. I just looked out the window and seen who it was, and I told my dad to tell them that I didn't want to see them, but he didn't—he goes out and tells them that I am not at home.

"Q. Did they come again?

"A. Yes, sir, they came, again, at about Twelve o'clock, or something like that.

"Q. Late in the night?

"A. Yes, sir.

"Q. And what happened then?

"A. He told them that I was not at home.

"Q. Did they come, again?

"A. Yes, sir, they came, again, at about 4:30 or Five o'clock in the morning, when my dad was getting up to go to work.

"Q. And what happened then?

"A. Well, he went on to work—

"Q. I mean, insofar as they are concerned?

"A. Well, my dad told them—he went out and talked to them. I stayed in the house.

"Q. Did you hear anything that was said?

"A. No. I didn't hear nothing that was said then.

"Q. Did they leave, or did they stay?

"A. No, sir, they left.

"Q. All right, now then, did you see them, again, that morning?

"A. Yes, sir; I was getting up and getting ready to carry my mother to town, and I was going to go to the rodeo that afternoon, and she wanted to carry her pecans to town. And so, I had went down to the barn to feed my horse, and I had fed my horse and had started back to the house, and they drove up.

"Q. They drove up to your father's home?

"A. That is right.

"Q. What happened then?

"A. Well, Cliff—this 'Gene Taylor', or Cliff Roberts, got out of the car and came around and talked to me and asked me where I had been, and I told him that I had been in jail. And he said, 'Well, you lied to me one time', and says, 'and I am getting tired of you lying to me,' and says, 'I have messed around here all night waiting on on

you'. And I said, 'Well, I hate that'. And then he says, 'Well, are you ready to go, or what are you going to do?', and I said 'Well, I have got to take my mother to town' and I said 'and you all just follow me on up that way'.

"Q. Where did you go?

"A. I brought her to this produce down here, and she sold three sacks full of pecans. And they pulled up in behind me.

"Q. What kind of sacks?

"A. Just tow sacks—regular gunny sacks.

"Q. Similar to this exhibit that has been introduced into evidence here today?

"A. Yes, sir.

"Q. All, right.

"A. And I carried the pecans in and they emptied them out of the sacks into a great big sack that will hold several hundred pounds of pecans. And I brought the sacks back. And they paid my mother for them, and then I proceeded on out between Garr Corner and Stratford, and We stopped at Garr Corner and they parked their car there and got in with me and I carried my mother on over there and left her at her brothers. And when we came back by Garr Corner, why, Cliff Roberts picked his car up, and Mr. Casey rode on down the road with me, and he asked me, he said, 'You are not stealing this marijuana, are you?' and I said, 'No'. And he said, 'Who does it belong to?', and I said 'Well, so far as I know, it belongs to a dead man'—

"Q. Now, who was that?

"A. What?

"Q. Who was that?

"A. Well, I just was telling him about Skeet Kyser—That is who I was speaking of.

"Q. And was he dead?

"A. Yes, sir, he was dead."

They all got in Riddle's car and proceeded to the country. Riddle stopped the car, got out and took the sack, and climbed over the fence. Officer Casey went with him. Riddle testified as follows:

"A. —Casey. And so, he was carrying the sack, and I was gathering the weeds and putting them in it, and we got on up there and I looked and he was away back behind me, and so, he didn't have the sack, and I had a big armload of weeds gathered up, and I said, 'You go get the sack', and he said, 'All right'. And he had a bunch of weeds gathered up. He goes down there and gets the sack, and I am walking down the branch, and he takes his weeds and puts them in, and I fill it full of them, too. And so, that was all of them kind of weeds that I could see down there, and so, that sack was full, and we started on back to the car—me and Casey. We got back there and climbed over the fence and I said, 'Well, I will go across the road and look and see if there is any more', and when I started around in front of the car, they arrested me.

"Q. All, right, what happened then?

"A. Well, they got the sack, then, out and they poured all of the stuff out of the sack there and they got to arguing over it—one of them said that it was marijuana, and the other one said that it wasn't. And then, one of them said a vulgar word to me and said, 'You must think that you are awfully smart, or that we are awfully dumb'.

"Q. Did you hear Mr. Casey testify here a short time ago that he thought you were trying to sell him a sack full of weeds, and accused you of it?

"A. Yes, sir.

"Q. Did that happen?

"A. That is right."

This portion of the testimony was substantiated by Officer Casey:

"Q. Now, how about this armload of weeds that you were talking about —what were they and what were you doing with them?

"A. Those were what Riddle cut and handed to me, and what he purported to be marijuana, but of course, I knew better. And, after he was arrested, I accused him of handing those to me in an attempt to sell me something just to fill up the sack, and he agreed that that was what he was attempting to.

"Q. All right, that is what I am driving at. He took you boys out there and was going to sell you three gunny sacks full of weeds for nine hundred dollars, wasn't he—that is what you thought—

"A. No, sir. He would have sold us marijuana, but he couldn't find that much marijuana—somebody had beat him to the patch, and he complained about it."

According to Officer Casey, the Laboratory Report showed there were three oz. of marijuana in the sack. This set of facts constituted the premise upon which defendant bases his defense of entrapment. Granville Humphrey was not called as a witness. His testimony would have been very important to the State as it left standing alone the testimony of the defendant as to who conceived the plan in its inception. Humphrey was acting as an agent for the Narcotics Bureau. Roberts verified that by testifying:

"Q. Now you were working with Mr. Humphrey in this thing insofar as Joe Riddle was concerned?

"A. Mr. Humphrey was a special employee, a paid informer.

"Q. Of the Narcotics Bureau?

"A. Yes."

The uncontradicted testimony shows that the crime was conceived by Humphrey. He brought it up to the defendant. He made the plans, he called Roberts, he got defendant and Roberts together. The State made no effort to refute this testimony. They apparently made no effort to obtain the testimony of Humphrey. The rule is well stated in 22 C.J.S. Criminal Law § 45(2), page 140:

"In other words, if the criminal intent or design to commit the offense charged originates in the mind of the person who seeks to entrap accused and to lure him into commission of the crime merely for the purpose of arresting * * * him his acts in inducing the commission of the crime constitute entrapment and no conviction may be had."

This Court said in the case of Finley v. State, 84 Okl.Cr. 309, 181 P.2d 849, in the 19th Syllabus:

"If an officer or decoy suggests the commission of a crime, or artificially propagates its inception, or lures another otherwise innocent person to commit the crime, and the decoy performs an act essential to the crime, a conviction cannot be had on such a basis for that is entrapment."

Oklahoma Courts stated in the case of Rider v. State, 53 Okl.Cr. 393, 12 P.2d 552:

"A decoy may be used to detect or entrap a criminal, and as such may afford an opportunity for a criminal to commit a crime, and may be present apparently assisting in the commission of the crime, and such action on the part of the decoy will not constitute a defense. But, when the decoy first suggests, initiates, or induces the commission of the crime, or, as it sometimes said, 'artificially propagates' the crime, and thereby lures an otherwise innocent person to aid and abet him, or where the decoy himself does some act essential to the crime charged, a sound public policy will not uphold a conviction."

After Roberts arranged to meet defendant at Katy's Drive-In to consummate the deal, it appears the defendant abandoned the plan. When defendant did not meet the officers at the designated place, they

went to his father's house. The father, at defendant's request, told them that the defendant was not there. They returned two or three times as late as 4:30 in the morning and was advised by defendant's father he was not there. They surveiled the house all night, and about 11:00 the next morning they saw defendant go to the barn to feed his horse and they approached him again about a performance of the plans.

The question arises, would defendant have committed the crime if he had not been persistently pursued by the assiduous officers? The evidence shows that the crime was suggested by Humphrey, a Bureau Agent. Defendant apparently had abandoned any idea of going through with its commission until relentlessly urged upon him by the officers.

In the case similar to the one at bar, the U. S. Court of Appeal said in the case Morales v. United States, 6 Cir., 260 F. 2d 939:

"Where there was no proof that defendant had any contact with persons engaged in illicit sale of narcotics or any evidence whatsoever of circumstances that would justify even a reasonable suspicion that defendant was engaged in traffic of narcotics, and defendant was not an addict and had no criminal record, and defendant obtained and transferred marijuana only after being repeatedly requested to do so by undercover agent of the government, there was 'entrapment' and defendant could not be convicted of transferring marijuana without proper authorization."

The Criminal Court of Appeals has defined "entrapment" in Crosbie v. State, 330 P.2d 602, as follows:

" 'Entrapment' is the planning of an offense by an officer, or someone acting under his direction, and his procurement by improper inducement of its commission by one who would not have perpetrated it, except for the trickery of the officer."

Ordinarily the question of entrapment is one for the jury. The rule generally followed was laid down in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848:

Whether a defendant had been entrapped is for the jury, unless, it can be decided as a matter of law and its mandate was to remand the case to the District Court with instructions to dismiss the indictment, since, undisputed facts establishes entrapment. See also, Sorrells v. State, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413.

The Court is of the opinion that this is a very close question of law. The conflict in the testimony of Roberts and the defendant may have justified the Court in submitting the question of entrapment to the jury under proper instruction. The Instruction given clearly covered defendant's theory of the case. However, defendant was placed at a decided disadvantage with the jury in this regard when Officer Roberts, out of a clear blue sky, voluntarily offered the testimony that "I had bought from him before." (C.M. 78)

The record is completely void of any previous conviction of any kind. As far as the record is concerned, the defendant was of previous good reputation, and this statement was highly prejudiced and detrimental to the defendant. It is known as an "Evidentiary Harpoon" at which Officer Roberts is an expert. This officer was verbally spanked in a recent decision of this Court, Titsworth v. State, 368 P.2d 526, wherein he was guilty of the same conduct. The Court said:

"We do not believe that the court should sanction the conduct of Officer Roberts. He is an experienced police officer and thoroughly familiar with the rules of evidence. It is the opinion of this writer that the witness' response was made solely for the purpose of relating the planning of a crime not germane to the issues of the case and that it was calculated to prejudice the jury against the defendant.

It is evident that the volunteer statement of this witness achieved its desired effect."

The law is well established that experienced police officers should not, while on the witness stand, make voluntary statements prejudicial to the rights of the defendant on trial. See Tucker v. State, 89 Okl.Cr. 30, 204 P.2d 540; Bullock v. State, 96 Okl.Cr. 292, 253 P.2d 197.

Since the question of entrapment was presented to the jury, a voluntary statement such as this could very easily have made the difference. The eagerness of Roberts to convict has proved costly to the State. The statement was improper, inflammatory, and highly prejudicial.

The Court is of the opinion that as a result of the improper rebuttal by Officer Bergman in bolstering the testimony of Roberts, and the closeness of the question of entrapment, which was presented to a jury under circumstances that was a decided disadvantage to defendant, and because of Officer Roberts prejudicial remark, the Court feels the Defendant was denied a fair and impartial trial.

The Judgment and Sentence of the trial court is hereby reversed and the case remanded for a new trial.

BRETT and BUSSEY, JJ., concur.