Mike KISSICK, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17588.

Court of Criminal Appeals of Oklahoma.

Dec. 13, 1972.

Rehearing Denied Jan. 4, 1973.

Richard L. Hasley, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., Kenneth L. Delashaw, Jr., Legal Intern, for appellee.

OPINION

BUSSEY, Presiding Judge:

Appellant, Mike Kissick, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Oklahoma County, Oklahoma, for the offense of Unlawful Distribution of a Controlled Dangerous Substance; his punishment was fixed at five (5) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Robert Taylor testified that he was employed by the Oklahoma City Police Department. In September of 1971,

he was assigned to the vice squad as an undercover agent. At approximately 9:30 p. m. on September 29, 1971, he, Tom Huey and Joe Cooley went to the defendant's apartment on North Penn. Cooley knocked on the apartment door and the defendant came to the door. Cooley introduced them to the defendant as friends of his. Cooley told the defendant that they "might be interested in buying some cocaine from him that he was selling." (Tr. 5) They went into the kitchen and sat down at the table. Defendant went into another room and brought back a piece of white notebook paper which was folded up. The defendant unfolded the paper, declaring that the white powdery substance was cocaine or "coke". Defendant brought a sheet of aluminum foil to the table and instructed Huey to tear off a small piece. The defendant then took a small plastic spoon and "put out what is known as a dime bag of cocaine." He gave the defendant a Ten Dollar bill and put the tin foil in his pocket. They had a further conversation about the possibility of buying some more drugs later, preferably "hash or heroin." Upon leaving the apartment, they met with Detectives Scott and Shahan. The evidence was initialed, placed in an evidence envelope and turned over to Detective Scott.

On cross-examination, he testified that the defendant tried to sell them all of the cocaine that he had but they told him that they wanted to try it out first to see if it was any good. He testified that a few days after the initial purchase, they made a second purchase of cocaine from the defendant. He denied that the cocaine from the second purchase came from the same white package.

Officer Scott testified that on the evening of September 29, he introduced Joe Cooley to Officer Taylor at Shepherd Mall. He followed Cooley, Taylor and Huey to an apartment complex on North Pennsylvania. They went into an apartment and remained approximately twenty minutes. He followed them back to Shepherd Mall and was given a small tin foil

package by Officer Taylor containing a white powder. The evidence was initialed, placed in a State Bureau Evidence envelope and sealed. The evidence was then placed in the property room of the police station.

On cross-examination, he testified that he knew that Joe Cooley had previously been charged with Possession of LSD.

Officer Willis testified that he removed State's Exhibit 1 from the property room of the police station and transported it to the laboratory of the Oklahoma State Bureau of Investigation.

William Caveny testified that he was employed as a chemist by the Oklahoma State Bureau of Investigation. He conducted an analysis of the contents of State's Exhibit 1 and was of the opinion that there was cocaine present in the substance.

Thomas Huey testified that he was a machinist and assisted the police department in making narcotics "buys". His testimony as to what transpired during the evening in question did not differ substantially from that of Officer Taylor.

For the defense, the defendant testified that he was a senior at Putnam City High School and had known Joe Cooley for approximately one year. He testified the Joe Cooley was a very good friend and that they visited in each other's homes. On September 9, Cooley informed him that he had started on heroin. Cooley approached him several other times and pleaded with him to get him some heroin. On September 14, Cooley asked him if he could get cocaine. He informed Cooley that he didn't have anything to do with it. Cooley continued to ask him to obtain cocaine for him. He again told Cooley that he didn't know any people that sold cocaine but finally agreed to see what he could do. He subsequently purchased the cocaine for him for Forty-five Dollars ($45.00). On September 29, he told Cooley that he had obtained the cocaine and agreed to meet him at 11:00 that night. Cooley, Huey and Taylor came to the apartment and said

that they only wanted Ten Dollars ($10.00) worth. He testified that his agreement with Cooley was that he was to get all of the cocaine. He was not familiar with cocaine and Taylor showed him how to measure Ten Dollars worth. They told him that they would meet him later at the "Zig Zag" and get the rest of the cocaine. On October 3, he went to the Zig Zag and had a conversation with Huey. He asked Huey if the powder was cocaine. Huey replied, "Yeah, it's pretty good" and that they wanted some more. They went back to his apartment and they bought Twenty Dollars ($20.00) worth.

He testified on cross-examination that he was visiting a friend of his at OU and some guy came up asking if anyone wanted to buy a gram of cocaine. He stated, "I have a friend who has been wanting me to get him some." He denied selling any hashish or other drugs to Cooley prior to September 29.

Joe Cooley testified that he was eighteen years old and a junior at Putnam City High School. He and the defendant were friends and ran around together. On August 26, 1971 he was arrested for Possession of LSD. Shortly thereafter, he agreed to work with the police department in buying drugs. He approached the defendant sometime in September and asked him to get heroin for him. He also on one occasion asked the defendant about cocaine. He testified that he did not ask the defendant to get it from anybody stating, "He already had it."

On cross-examination, he testified that on September 15, 1971, he purchased what was purported to be mescaline and hashish from the defendant.

Randy Mosier testified that he had known Joe Cooley for about one year. On September 29, he was present in the defendant's apartment when Cooley, Taylor and Huey arrived. Cooley asked defendant if he had the cocaine and stated that he only wanted Ten Dollars ($10.00) worth. He testified that the defendant did not know how much Ten Dollars worth

was. He had previously heard Cooley ask the defendant to get him cocaine or heroin.

Micheal Heenan testified that he was an instructor of English at the University of Oklahoma. He was acquainted with Joe Cooley and had known him for approximately two years. In November of 1971, he had several conversations with Cooley concerning the defendant's arrest. Cooley stated that he was arrested in August for Possession of LSD and that this influenced his judgment in agreeing to work for the police. He stated to Heenan that he had "set up" several of his friends, including the defendant.

Beverly Phillips testified that on September 29 she met the defendant and Randy at the fair at approximately 9:30 that evening. The defendant stated that he had to go back to his apartment to meet Cooley at 11:00. When she and Susie Smith arrived, "they had some stuff on the table." Before Taylor, Huey and Cooley left they asked the defendant if he could get them some more cocaine and maybe some "smack". Defendant stated that he would not because he was doing this only as a favor to Joe.

The sole proposition asserts that the trial court erred in overruling defendant's demurrer to the evidence and motion to dismiss for the reason that the defendant was entrapped into the commission of the alleged offense. We need only observe that the trial court properly instructed the jury on the defense of entrapment. In Kite v. State, Okl.Cr., 490 P.2d 1402, we cited with approval Riddle v. State, Okl.Cr., 373 P.2d 832, wherein the Court stated:

"Whether a defendant has been entrapped is to be determined by the jury, unless it can be decided as a question of law upon undisputed facts sufficient to to [sic] establish entrapment."

In the instant case, entrapment could not be decided as a question of law upon sufficient undisputed facts and the question was, therefore, properly submitted to the jury who chose to not believe the defend-

ant's testimony. The judgment and sentence is accordingly affirmed.

BLISS, J., concurs.

BRETT, J., dissents.

BRETT, Judge (dissenting):

I am compelled to respectfully dissent to this decision. In Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 2d 848 (1958), the United States Supreme Court concluded from the evidence in that case "that entrapment was established as a matter of law." In that case the informer testified as a government witness, and from his testimony the Supreme Court concluded that the informer induced the defendant to engage in the sale of narcotics. In the instant case, defendant subpoened the informer to testify as a defense witness. Consequently, the decision in the instant case cannot be predicated upon the state's testimony alone, as was done in Sherman v. United States, supra.

To make its case of the illegal sale of cocaine in this instance, the state called three police officers, the chemist, and one Thomas Huey, who testified concerning the illegal sale of cocaine by defendant on September 29, 1971. At the conclusion of the state's case, defendant's demurrer to the evidence, was overruled.

Defendant testified in his own behalf. Defendant was a student at Putnam City Highschool and related that the informer, Joe Cooley, on numerous occasions at the school, asked the defendant to get some heroin for him; but when defendant persistently declined to get heroin, Cooley asked defendant to obtain some cocaine for him. Defendant testified that the only reason he obtained the cocaine was because his good friend Joe Cooley said he needed it. Defendant also related that he obtained the cocaine merely by chance while visiting a friend at the University of Oklahoma in Norman. Defendant admitted the sale in the instant case, but denied that he had made any sales of narcotic drugs prior to this instance. Defendant testified that he had not been arrested for anything except for a charge of "Loitering." Defendant explained the arrangement for the meeting on the night of September 29th, and testified that he had been at the State Fair, but left in time to return to his apartment by 11:00 p. m., to meet his friend Joe Cooley and deliver the cocaine to him. When Cooley arrived he introduced Officer Taylor and Tom Huey as friends of his, and asked for the stuff. Defendant testified that he expected Cooley to take all the cocaine, but Taylor insisted that they only wanted Ten Dollars worth. Defendant's testimony concerning Cooley's insistance that defendant get the cocaine for him was corroborated by at least two other witnesses, Loyd Mosier and Beverly Phillips.[1]

Randal Loyd Mosier, a student at the same highschool, testified that he heard Joe Cooley ask defendant to get cocaine for him on numerous occasions. He said that on September 29th he was with defendant at the State Fair, returned with defendant to defendant's apartment, and was in the apartment when the cocaine was delivered to the three men. Mosier testified that he had heard Joe Cooley ask other students to get narcotics for him. Beverly Phillips also testified that she was with defendant and Mosier at the State Fair, and that they left to return to defendant's apartment. Later, she went to defendant's apartment while the three men were still there, and she testified that she heard defendant tell Joe Cooley he would not get any more narcotics for Cooley or the other two men.

Defendant subpoenaed the informer, Joe Cooley, to testify. Cooley admitted that he had been arrested for possession of LSD, and that the charge was still pending against him; and that it was not until after he was arrested that he agreed to become an informer for the police. He admitted that he asked the defendant to get

---

1. For a portion of defendant's testimony, concerning Cooley's efforts to get defendant to get narcotics for him, see Appendix hereto.

some heroin for him, but defendant did not get any for him. He also admitted that he asked defendant to get some cocaine for him, and it was that cocaine defendant was convicted for delivering to Cooley, Officer Taylor, and Tom Huey, and caused this charge to be filed. He testified that in late August, or early September, he asked defendant to get some heroin for him, and later in September he asked defendant to get the cocaine for him, but he related that he considered the two requests to be separate deals. Cooley also admitted that he had set up arrangements for the arrest of several other students on narcotics charges.

Michael John Heenan, an instructor at the University of Oklahoma at Norman, testified that he knew Joe Cooley and that Cooley had confided in him that he had set up the arrest of Mike Kissick, as well as the arrest of several other students, on narcotics charges. He testified also that Cooley told him that the reason he became involved in the informer business for the police, was because he was fearful of the outcome of the LSD charge unless he did cooperate.

None of the testimony offered by defendant, asserting that he was induced or lured into getting the cocaine for Joe Cooley, the police agent, was refuted by the prosecution; nor was there any showing by the prosecution that defendant was a willing seller of narcotics, awaiting a propitious opportunity to sell narcotics. As I review the record of this trial, defendant met his burden of proof, showing that he was induced or lured into the commission of the offense by the police agent; and certainly, the one arrest for the questionable offense of "loitering" does not indicate that defendant has a propensity to sell illegal drugs.

In finding that as a matter of law the defense of entrapment was established, reversing the conviction in State v. Boccelli, 105 Ariz. 495, 467 P.2d 740 (1970), the Supreme Court of Arizona recited the following:

"The defense of entrapment is founded on the public policy that the tempting of innocent persons into violations of the law by enforcement officers will not be tolerated. The Supreme Court of the United States in a leading case said: 'In Sorrells v. United States, [287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413,] * * * this Court firmly recognized the defense of entrapment in the federal courts. The intervening years have in no way detracted from the principles underlying that decision. The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, "A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." 287 U.S. [435], at page 442, 53 S.Ct. [210], at page 212, [77 L. Ed. 413]. Then stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations. Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 820–821, 2 L.Ed. 2d 848."

In cases involving the defense of entrapment, two questions arise: (1) did the police agent induce the accused to commit the offense charged; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense. On the first question, the accused has the burden of proof; on the second one the prosecution has the burden of proof. See Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962), and United States v. Sherman, 200 F.2d 880 (2d Cir.

1952). In the instant case, defendant met his burden of proof, but the prosecution did not meet its burden.

While determining that as a matter of law the defense of entrapment was established, and reversing the conviction in State v. Sainz, 501 P.2d 1247 (1972), the Court of Appeals of New Mexico said the following:

"It is fundamental that the basic thought behind the doctrine of entrapment is that officers of the law should not incite crime merely to punish the perpetrator. The question of accused's predisposition tends to a subjective standard which varies from case to case and person to person. The issue is better framed in ' . . . the objective terms of whether persons at large who would not otherwise have done so would have been encouraged by the government's actions to engage in crime. The focus . . . [should be] on the activities of the government and their relation to the reasonable man.' Working Papers of the National Commission on Reform of Federal Criminal Laws, Comment on Entrapment, July 1970, Vol. I, p. 303. Otherwise the doctrine of entrapment will remain as ' . . . gropingly . . . [expressing] the feeling of outrage at conduct of law enforcers . . . but without the formulated basis in reason that it is the first duty of courts to construct. . . .' Sherman v. United States, supra; Comment, The Constitutional Status of the Entrapment Defense, 74 Yale L.Rev. 942 (1965)."

This Court said in Finley v. State, 84 Okl.Cr. 309, 181 P.2d 849 (1947):

"If an officer or decoy suggest the commission of a crime, or artificially propagates its inception, or lures another otherwise innocent person to commit the crime, and the decoy performs an act essential to the crime, a conviction cannot be had on such a basis for that is entrapment."

And in Rider v. State, 53 Okl.Cr. 393, 12 P.2d 552 (1932), this Court said:

"A decoy may be used to detect or entrap a criminal, and as such may afford an opportunity for a criminal to commit a crime, and may be present apparently assisting in the commission of the crime, and such action on the part of the decoy will not constitute a defense. But, when the decoy first suggests, initiates, or induces the commission of the crime, or, as it sometimes said, 'artificially propagates' the crime, and thereby lures an otherwise innocent person to aid and abet him, or where the decoy himself does some act essential to the crime charged, a sound public policy will not uphold a conviction."

This Court defined "entrapment" in Crosbie v. State, Okl.Cr., 330 P.2d 602 (1958), as follows:

" 'Entrapment' is the planning of an offense by an officer, or someone acting under his direction, and his procurement by improper inducement of its commission by one who would not have perpetrated it, except for the trickery of the officer."

The record in this case is completely void of any previous conviction for any misdemeanor or felony. The only arrest defendant sustained was on April 1, 1971, for the petty offense of "loitering." The following July 28, 1971, this Court held the Oklahoma City Loitering Ordinance to be unconstitutional. Consequently, so far as the record of this trial is concerned, the defendant was of previous good reputation, and may be considered to be an innocent person as contemplated by the definitions pertaining to entrapment.

Therefore, I am of the opinion the time has come for the courts of this State to rule on the defense of entrapment as a matter of law. In the instant case, defendant clearly established his defense of entrapment and the trial court should have sustained defendant's demurrer and motion to dismiss after both sides rested. I can see no difference between the trial court's ruling on a demurrer to the evidence, the voluntariness of a confession, and the suf-

ficiency of the testimony to sustain the defense of entrapment. As Justice Roberts said in Sorrells v. United States, supra, and Justice Frankfurter repeated in Sherman v. United States, supra:

"The violation of the principals of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention."

I believe that statement is correct and that this conviction should be reversed and remanded with instructions to dismiss, notwithstanding the fact that this Court has heretofore held that entrapment is a matter to be submitted to the jury. The law of entrapment is well established—it has been stated and restated—and when its tenets have not been met, the courts should so state. And further, when the trial court fails to meet that charge, I am convinced this Court should analyze the testimony, and if the defense has sustained its burden, this Court should find as a matter of law the defense of entrapment was established.

Notwithstanding the fact that defendant did not request a cautionary instruction, this Court held in Smith v. State, Okl.Cr., 485 P.2d 771 (1971), that such instruction is a fundamental requirement when informers are used as in the instant case. In Smith v. State, supra, the following was stated:

"In Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), the United States Supreme Court held: 'The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions.' 343 U.S. at 757, 72 S.Ct. at 973.

"It is the duty of the trial court to give proper instructions as required by the evidence. Lester v. State, Okl.Cr., 408 P.2d 563. A defendant has a fundamen-

tal right to instructions necessary for a fair and proper determination of the issues presented. Townley v. State, Okl. Cr., 355 P.2d 420. Hall v. State, Okl. Cr., 316 P.2d 620. We, therefore, conclude that under the facts herein defendant was denied a fair trial by the failure of the trial court to give a cautionary instruction as to the testimony and credibility of the informer whose testimony alone placed defendant at the scene of the crime."

The District of Columbia Court of Appeals held in Fletcher v. United States, 81 U.S.App.D.C. 306, 158 F.2d 321 (1946), that a special instruction on an informer's credibility is defendant's right. The Supreme Court of Alaska provided in Fresneda v. State, (Alaska 1971), 483 P.2d 1011, "Because of known unreliability of certain types of accomplice and informer testimony, jury should be instructed that testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by jury with greater care than testimony of an ordinary witness." See also Williamson v. United States, 311 F.2d 441 (5th Cir. 1962).

In Hughes v. United States, 427 F.2d 66 (9th Cir. 1970), the Court of Appeals stated:

"In a criminal trial, the fact that a principal actor in the criminal transactions is awaiting trial or sentence on a narcotics charge is certainly relevant to a proper assessment of his credibility; the hope or promise of some reward in the way of immunity, preferential treatment or lighter sentence provides a possible motive both for entrapping the defendant and for testifying falsely at the trial." at page 68.

Therefore, for the foregoing reasons, I am compelled to dissent to this decision. Instead of affirming the conviction, I believe this conviction and any other charges arising out of the same circumstances which caused this conviction, should be reversed and dismissed.

## APPENDIX TO DISSENT IN KISSICK v. STATE

Defendant's direct-examination testimony, bearing upon the defense of entrapment, as shown by the transcript of testimony on pages 67, 68, 69, and 70.

"Q. Mike, prior to August of 1971, did you ever sell anything in the way of narcotic drugs to Joe Cooley?

"A. No.

"Q. Did you ever sell any narcotic drugs to anyone?

"A. No.

"Q. Mike, tell the court and jury exactly what happened beginning around the first of September, the first of the school year of this particular year, concerning your relationship with Joe Cooley.

"A. Yes. Shall I start—do you mean when Joe came up to me and was—Well, I didn't see Joe around the first of the school year, I don't know why. I guess he was busy. I hadn't seen him very much at all. And then it was on Thursday, September the 9th, he came up to me in the hall. I was going to class. I think, I believe I was going to fifth hour or something like that, and he came up to me and he said—I asked him what he had been doing and he said that he had started on heroin and, you know, I didn't believe it. I thought he was just joking. And he asked me, he said, 'Do you know anyone who has any heroin?' And I said, 'No.' I was going to class and he was going to his class. And then the next day I saw him. He was the hall proctor on the fifth hour and I was leaving class, I had an early release because I'm a senior. I was going home. I was on my way home and I saw Joe as a hall proctor. A hall proctor is one of these people that checks hall passes when you are going through the hall. And so I stopped and went over there and I said, 'You were just kidding me' you know, 'about what you said.' And he said, 'No, I have tried it about six times.' And I said, 'Where are you getting it?' And

he said from friends in Memorial Park. And he asked me, he said, 'I can't find these friends.' He said, 'Do you think you can help me get some?' He said he wanted a large quantity, I don't know why, and I said, 'No.', you know, and just left it at that. And then I didn't see him that weekend or nothing. I didn't see him again until the 14th again at school. He made so many pleadings to me all the time. I can't name specific dates that I can put together but I saw him all the time, and then I didn't see him anymore that weekend. Then on the 14th of September, I believe it was a Tuesday, the same thing. He was fifth hour hall proctor. I'm on my way home, going through the hall every day and he said, 'Well, do you know any people that sell cocaine?', you know, and I said, 'I don't have anything to do with it, Joe. I don't have anything to do with it.' And so I went on, but then the 18th, I was living at the Donita Apartments, apartment 19, and Joe came over, you know. It was Saturday night, the 18th, and he came over to visit, you know, and stay a little while, and he asked me, you know, if I would do this again. He said, 'I want some cocaine.' I said, 'Why can't you get it from the same people you got it from?' I said, 'I don't have anything to do with it. I've never done cocaine.' I didn't know what it looked like but he seemed convinced, you know, that I could find it some how, I don't know, but he kept asking me, you know, to do this for him, you know. He was a good friend of mine, you know. I didn't think anything about it, you know. I said, 'Well, I told all our mutual friends. I told them what you asked me to do and they couldn't believe it.' You know, they couldn't believe that Joe was doing this. They couldn't believe that he was doing heroin. They couldn't believe none of it. And they told me, they said, 'Don't have anything to do with it. We don't want to see Joe that way.', you know. So I told him that they said that and he said, 'Who is it that is saying all these

things?' He said, 'I'll take care of them.' He said, 'It's none of their business what I do, and you don't have any business listening to them' And so, you know, he left. He left, he didn't stay around. I don't know what was wrong with him. He just never stayed around anymore. And so I didn't—we walked on. I saw him several times within the next week but the next date that I can remember was on the 24th, it was on Friday night, me and Randy Mosier. We might have been with someone else, I don't remember but I don't think so. I remember it was Friday night because my girl friend was working at Shepherd Twin and she was working that night, so I was messing around with Randy. And we went over to Joe's house and Joe made the same thing. It was like he was, I don't know, he just—I didn't know what was in to him.

"Q. Well, did he ask you that particular evening to—

"A. Yes, he said he wanted heroin but he said cocaine would do fine."