UNITED STATES of America,
Plaintiff-Appellee,

v.

Leroy MOBLEY, Defendant-Appellant.

No. 27716.

United States Court of Appeals,
Fifth Circuit.

Jan. 16, 1970.

C. B. King, Albany, Ga., Thomas M. Jackson, Macon, Ga., for defendant-appellant.

Floyd M. Buford, U. S. Atty., Walker P. Johnson, Jr., Asst. U. S. Atty., Macon, Ga., for appellee.

Before BELL, AINSWORTH and CARSWELL, Circuit Judges.

AINSWORTH, Circuit Judge:

This criminal case involves the bizarre story of a cruel and brutal murder committed by two Georgia high school teachers, pressed by financial problems, who kidnapped a Georgia bank president at night from his home, robbed his bank, and killed him after a severe beating climaxed by shooting him.

This matter is before us for the second time. In his first trial, Mobley was convicted and sentenced to death for having violated 18 U.S.C. § 2113, pertaining to bank robbery, accompanied by assault and resultant death of the victim. Mobley appealed, challenging the racial composition of the grand and petit juries. We remanded the matter to the District Court, Mobley v. United States, 5 Cir., 1967, 379 F.2d 768, and an order was entered vacating the judgment and dismissing the indictment. Appellant was subsequently reindicted on the same charges, found guilty, and sentenced to 100 years' imprisonment on each of two counts.

A codefendant, Andrew R. Oliver, pled guilty at both trials. At the first trial, Oliver testified for the Government, admitting his guilt and incriminating Mobley. At the second trial, Oliver was again called as a Government witness, but after having taken the stand he refused to answer any questions. The complete transcript of his former testimony was admitted into evidence and read to the jury. Appellant alleges that the prosecution's introduction into evidence of the so-called "infected" testimony from an antecedent trial violated the confrontation clause of the Sixth Amendment of the United States Constitution. He also alleges that the District Court committed error in permitting the introduction of a statement of the victim as a dying declaration within the exception to the hearsay rule. We have carefully examined all the errors complained of, and for reasons hereinafter set forth in detail, we affirm the conviction.

On March 8, 1965, shortly after 10 p. m., the Exchange Bank of Unadilla, Unadilla, Georgia, the deposits of which are insured by the Federal Deposit Insurance Corporation, was robbed of approximately $3,778. In the early morning hours of the following day, a night policeman in Unadilla, upon entering the bank, discovered the President of the Bank, Thomas E. Woodruff, covered with blood, lying in the area of the bank vault. Woodruff had been beaten and shot. He was taken immediately to a hospital and was there attended by Dr. Christmas, who later described the beating as the most severe one he had ever seen in his medical practice. Mobley was apprehended on the evening following the crime. Two days later, Mr. Woodruff died. Oliver fled the state but returned and surrendered himself to FBI authorities ten days following the robbery, at which time he admitted his participation in the crime and implicated Mobley. Based on information from Oliver, a search warrant was obtained for the Paradise Inn, which had been operated by Mobley, and a search revealed two bank bags containing $756 in coins, an iron reinforcing rod and clothing worn by Oliver and Mobley at the time of the robbery.

Agent Cheek of the FBI, who had investigated the scene of the crime, talked with Woodruff in the emergency room of the hospital, accompanied by Dr. Christmas and another FBI Agent. He obtained from the victim the following account of the robbery, which he was permitted to recount to the jury over defense objections. Woodruff had returned to his home from a Methodist Church stewards' meeting about 10 p. m. on March 8, 1965, and as he was pulling into his driveway he observed another automobile. As he opened the door of his car, two Negro males alighted from the other car. One of them was armed. At gunpoint they ordered him onto the floor of the back seat of their car. Because of the darkness and the fact that the men's faces were covered with masks, Woodruff did not recognize them, but noticed that they were of slender build, approximately 30 years old and appeared to be wearing suits. One was approximately 6 ft. tall; the other about 5 ft. 10 in. tall. He could not determine the color of the car, but it was a late model and possibly a Chevrolet. He remained on the floor of the car, covered with some type of rug, until they arrived at the bank, where at gunpoint he produced a

key and opened the rear door of the bank. He handed over $400 from the safety deposit vault, some change from another vault, and $300 from his wallet to the robbers. When Mr. Woodruff protested that he was unable to open the main inner vault because it was secured by a time lock which would not open until the following morning, the assailants began to beat and kick him and to stomp on his chest. One of the men held a revolver; the other, a rod. Woodruff did not remember being shot.

■ The admissibility of dying declarations, on behalf of and against an accused, has long been recognized by the Supreme Court as an exception to hearsay evidence. Such declarations are admissible to the fact of a homicide and to the person by whom it was committed, contingent, however, upon a showing that the declarer was aware of impending death at the time the statement was made. Mattox v. United States, 146 U.S. 140, 151, 152, 13 S.Ct. 50, 53, 54, 36 L.Ed. 917 (1892).[1]

Appellant contends that the Government failed to prove Woodruff's awareness of the gravity of his condition and that the admission in evidence of his declaration to FBI Agent Cheek was therefore error. Appellant predicates this conclusion on two premises. First, Woodruff was never told or never said that he was about to die. Secondly, he was given hope of recovery by the attending physician, who testified on cross-examination that he told his patient that he was in no condition to be transferred to another hospital, but in the event that he did improve he probably would be moved to a hospital where he would receive the attention of a specialist.

■ It is, of course, true that admission of utterances of a dying person should be received with great caution.

However, a declarant's sense of impending death may be made to appear "from the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive." Mattox v. United States, *supra,* 146 U.S. at 151, 13 S.Ct. at 54. The gravity and extent of those wounds were testified to by Dr. Christmas, the attending physician, who is also the County Medical Examiner. He repeatedly emphasized that he did not expect the patient to live through the day, or that he would die momentarily. Dr. Christmas testified that when Woodruff was admitted to the emergency room, his hair was matted with blood; there was consciousness but no detectable blood pressure. Multiple lacerations of the scalp extending all the way to the bone were so numerous that the scalp gave the appearance of having been beaten to a pulp. The chest, right upper arm and right shoulder were completely discolored with bruises. One thumb and a finger were broken; his hands were bruised and there was a wound in his right side. He was so badly disfigured that Dr. Christmas did not recognize him. X-rays revealed a fractured skull and a bullet lodged in the victim's chest. While Woodruff was in the X-ray Room, Mr. Cheek, the FBI Agent who had investigated the scene of the robbery, arrived and asked permission to speak with the patient. Because of the doctor's opinion that the patient's death was imminent, he felt that it was best that Cheek talk to him quickly while he was still conscious. When the doctor was asked by counsel if Woodruff knew of his condition, defense counsel objected and the jury was withdrawn. Dr. Christmas then answered that although Woodruff had not been told that death was imminent and he verbally expressed no awareness thereof, he, Dr. Christmas, was of the opinion that the patient knew

---

1. See also Carver v. United States, 164 U.S. 694, 695, 17 S.Ct. 228, 229, 41 L.Ed. 602 (1897); Dowdell v. United States, 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753 (1911); Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934); Pointer v. State of Texas, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965).

that his chances for living were "very slim." Later, in the presence of the jury, the doctor testified that Woodruff was aware that he had coronary artery disease and carried nitroglycerin with him. The patient was told by him that he would be able to see his family, his minister and bank officials. Prior to allowing the statement to be read to the jury the Court thoroughly instructed the jury that unless they found that the declarant knew of his impending death, they should not consider the contents of the statement. In an abundance of caution, the Court first withdrew the jury, prior to receiving the doctor's opinion of Woodruff's awareness of imminent death. We find no error of the Court in allowing the jury to hear Woodruff's statement. Moreover, there was overwhelming evidence of appellant's guilt independent of the statement. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The only information that the victim furnished other than the obvious facts that he had been brutally assaulted and a bank robbery had occurred, was a general description of the assailants whom he did not recognize.

Immediately following the discovery of the victim, an investigation was made at the scene of the crime by the Federal Bureau of Investigation. Woodruff's blood-soaked coat was found at the bank. Yarn adhering to the coat was identical to fibers in a carpet taken from appellant's car. Just prior to the robbery, two Negro males in a maroon-colored 1965 Ford Falcon had purchased three cans of "Colt 45" malt liquor from a service station, whose manager positively identified appellant as one of the purchasers. One such beer can was found in an alley close to the church where Woodruff had attended a meeting prior to his abduction and where a parked car had been seen. Another beer can of the same type was found on a road approximately one block equidistant from the bank and the Woodruff residence.

A neighbor of Woodruff who resided across the street testified that between 9:30 and 10 p. m. on the night of the robbery, he saw a strange-looking car slow down and almost stop in front of the residence. Approximately 10 to 15 minutes later, he saw the same car approach and then turn in to his own property to a point behind an old abandoned tenant house. This incident caused him to leave his house with the intention of investigating; however, the car pulled out at that time. Shortly afterwards, the car returned; it pulled into the driveway and stopped behind Woodruff's car. The neighbor described the car as red or maroon colored. Appellant owned such a car. On the day following the discovery of Woodruff in the bank, bank keys and bags containing money were found in a closet of appellant's classroom at the high school by a janitor at the school. Additional bags of money, blood-soaked clothing, and a blood-stained metal pipe were recovered from the loft of the Paradise Inn, a cafe operated by appellant. The blood on these instruments was determined to be of the same type as that of the victim. Pieces of human hair and woolen fibers adhering to the metal pipe were microscopically identical to samples taken from the victim's head and coat, respectively. A ballistics expert testified that the bullet removed from Woodruff's body was the same type as the five cartridges found in the gun taken from Oliver's room; that the bullet had been fired from a 6-groove barrel.

At the second trial of appellant, Oliver, who had previously on two occasions pled guilty, steadfastly refused to answer questions. His testimony given at the first trial of appellant was read to the jury, over objection of defense counsel. The testimony describes the manner in which Oliver and Mobley planned and executed the crime. They were good friends and both employed as school teachers at the same high school at Montezuma, Georgia, in the vicinity of Unadilla, Georgia. Mobley conceived the idea of robbing a bank several

months prior to the incident, after a discussion between them of their respective pressing financial conditions. Mobley later suggested the feasibility of robbing the Exchange Bank of Unadilla. A banker there kept late hours. There was a public restroom in an alley at the rear of the bank where the banker parked his car which would serve as a hiding place. When the bank official departed for the night, they would accost him, force him to open the vault and produce the money, then tie him up and leave. The money could be hidden until later. The plan was to use a disguise and to carry guns. Oliver succeeded in obtaining a gun from a pawn shop in Albany, Georgia. On March 1 or 2, 1965, armed with a gun and steel rod, the two men attempted to put their plan into action. They drove to Unadilla and disguised themselves. However, just as they were about to accost Woodruff, Mobley's stocking mask ripped. Fearing that Mobley would be recognized, the men discarded the plan temporarily. On March 8, another attempt was made. Mobley picked up Oliver in a 1965 burgundy-colored Ford Falcon and they drove to the bank. Again they were unsuccessful in their attempt to waylay Woodruff as he left the bank, so a decision was made to pick him up at his residence. Before doing so, the men stopped at a filling station and purchased several cans of "Colt 45" beer. They drove around town looking for Woodruff, passing by his home several times. At one time they parked in an alley across the street from the Woodruff residence and waited, but a barking dog and the sight of a neighbor emerging from his house sent the men off again in pursuit of their intended victim. Woodruff's car was finally seen parked in a church lot. Mobley pulled up into an alley in front of the church and he and Oliver sat, drank beer and waited. When Woodruff left the meeting, the men followed him to his home. Woodruff entered his driveway and alighted from his car, whereupon Oliver approached with a gun in hand and ordered the victim into Mobley's car. Woodruff was placed between the two men in the front seat,[2] and a rug-type floor mat was thrown over his head. Woodruff, begging not to be harmed, agreed to cooperate. At the bank, he unlocked the door and then produced money from a safety deposit vault, a wallet, and the outer vault leading to the main vault. The money was placed in a pillow case and several bank bags. Woodruff informed the men that because of a time lock on the main vault he had no access to its contents. Mobley then proceeded to beat him with the steel rod. Oliver dropped his gun and tried to pull Mobley away from Woodruff. In the scuffle, Mobley's face mask slipped. Mobley then grabbed the gun and shot Woodruff. After taking approximately $315 apiece, the men hid the remainder of the money and the bank keys in a closet adjoining Mobley's classroom at the high school. Mobley agreed to dispose of the disguise clothes in a loft above his shop (Paradise Inn). On the following day Oliver, being frightened, left town and traveled as far as Montgomery, Alabama. Word reached him that Woodruff had died and Mobley had been apprehended, whereupon he returned and surrendered himself to the police and FBI officials on March 18. Oliver identified the clothes, the murder weapons and the car used on the night of the crime.

We find no violation here of the principles expressed in Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) and Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed. 255 (1968), relative to the rights of an accused to confrontation and the opportunity to have a jury assess the demeanor and credibility of a witness. Both of these requirements were satisfied by the former trial, where the witness was under oath and thoroughly

---

2. It is noted that Woodruff's statement to the FBI Agent differed in that Woodruff said he was placed on the floor of the *back* seat.

examined on both direct and cross-examination, as evidenced from an analysis of *Mattox* and *Barber*. In *Mattox*, the Supreme Court affirmed the action of the trial court in allowing, at the second trial, a reading of a transcript of testimony of two witnesses who had been examined and cross-examined on a former trial and were no longer available because they had since died. It was the first time that this question had been presented to the Supreme Court, and after examining and citing numerous state decisions in which such evidence was found admissible, the Court said:

"[G]eneral rules of law of this kind * * * must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law, in its wisdom, declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused.

\* \* \* \* \* \*

"The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination." 156 U.S. at 243, 244; 15 S.Ct. at 340.

Death of a witness, moreover, is not the only predicate for relaxing the confrontation rule. In Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934), the Supreme Court noted:

" '[The privilege of confrontation] was intended to prevent the conviction of the accused upon depositions or ex parte affidavits, and particularly to preserve the right of the accused to test the recollection of the witness in the exercise of the right of cross-examination.' Dowdell v. United States, 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753. See, also, Wigmore, Evidence, vol. 3, §§ 1395, 1397, collating the decisions. *Nor has the privilege of confrontation at any time been without recognized exceptions,* as, for instance, dying declarations or documentary evidence. \* \* \* *The exceptions are not even static, but may be enlarged from time to time if there is no material departure from the reason of the general rule.*" [3] (Emphasis supplied.)

In Barber v. Page, supra, the Supreme Court reversed a conviction for lack of confrontation but on vastly different grounds. The principal evidence in *Barber* against the petitioner consisted of testimony from a preliminary hearing of a witness who implicated the accused. No cross-examination by defense counsel of the witness had occurred at the hearing. At the trial, the "State made absolutely no effort to obtain the presence of [the witness]." 390 U.S. at 723, 88 S.Ct. at 1321. Here, by contrast, the testimony admitted was not from a preliminary hearing but from a "full-fledged" trial,[4] at which the same counsel who later represented appellant in the second trial, fully cross-examined the witness, and the presence of that witness was secured by the prosecution at the second trial. Oliver's silence in

3. See also West v. State of Louisiana, 194 U.S. 258, 265, 24 S.Ct. 650, 653, 48 L.Ed. 965 (1904), *reversed on other grounds,* 380 U.S. 400, 85 S.Ct. 1065 (1962); Holman v. Washington, 5 Cir., 1966, 364 F.2d 618, 624; Virgin Islands v. Aquino, 3 Cir., 1967, 378 F.2d 540, 548, 549; United States v. Allen, 10 Cir., 1969, 409 F.2d 611; Narum v. United States, 1960, 287 F.2d 897, 900, 151 Ct.Cl. 312.

4. Pointer v. State of Texas, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965).

reliance, albeit misplaced,[5] upon Fifth Amendment rights, makes him no less unavailable than death or absence from the country or physical inability to speak. The type of situation which exists here was recognized by the Court in *Barber* and excepted from its holding:

> "It is true that there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. E. g., Mattox v. United States, supra (witnesses who testified in original trial died prior to the second trial). This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement. See 5 Wigmore, Evidence §§ 1395–1396, 1402 (3d ed. 1940); C. McCormick, Evidence §§ 231, 234 (1954)." 390 U.S. 722, 88 S.Ct. 1320.

Although the Court in *Barber* said that it would have reached "the same result on the facts of this case had petitioner's counsel actually cross-examined [the witness] at the preliminary hearing," it recognized an important distinction between an ordinary preliminary hearing and a trial:

> "A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining

whether probable cause exists to hold the accused for trial. While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case." 390 U.S. at 725, 726, 88 S.Ct. at 1322.

The Supreme Court in Pointer v. State of Texas, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 1070 (1965), recognized the principle that prior thorough cross-examination of a witness unavailable at a trial adequately satisfies the confrontation requirement of the Constitution. In holding that a transcript from a preliminary hearing at which defendant was not represented by counsel was a denial of the constitutional rights to confrontation, the Court said:

> "The case before us would be quite a different one had Phillips' statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine." [6]

██ Neither the United States Constitution nor any interpretation of it by the Supreme Court prohibits the use of the testimony introduced under the circumstances of this case.

We find no merit to any of the contentions raised by appellant.[7] The evidence of defendant's guilt is overpowering. His conviction is

Affirmed.

5. Oliver had already on two occasions pled guilty to the charge. His privilege ed. He could not further incriminate himself. Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); United States v. Romero, 2 Cir., 1957, 249 F.2d 371; Edmonds v. United States, 1959, 106 U.S.App.D.C. 373, 273 F.2d 108.

6. See also Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900).

7. We believe the Trial Judge in the proper exercise of sound discretion, committed no error in permitting FBI Agent Cheek to remain in the courtroom throughout the trial, despite defense counsel's motion that he be sequestered. See Del Cristo v. United States, 5 Cir., 1964, 327 F.2d 208.