**Arthur FRESNEDA, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1287.**

Supreme Court of Alaska.

March 31, 1971.

W. G. Ruddy, Juneau, for appellant.

G. Kent Edwards, Atty. Gen., Gail Fraties, Dist. Atty., Joseph D. Balfe, Asst. Dist. Atty., Juneau, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

In the case of Fresneda v. State, 458 P. 2d 134 (Alaska 1969), this court reversed appellant's first conviction for possession and sale of marijuana. He was tried again December 29–31, 1969, and again convicted, from which conviction he brings this appeal.

Fresneda was found guilty on one count of possession of marijuana and another of sale of marijuana to a minor, a second possession count having been dismissed by the state during the trial. The state's principal witness was Mrs. Sherry Meachem Freheit.[1] At the time of the offense, in December, 1967, she was 16 years old and already married and the mother of a young baby. Since that time she has been divorced, remarried to another man, divorced again and remarried to the same man, and is apparently involved in still another suit for divorce. Both the girl and her mother were well acquainted with Sgt. John Cunningham of the Juneau police, a detective whose duties included working with juveniles. They knew Sgt. Cunningham as a family friend, from whom they sometimes sought advice on family problems.

In November of 1967, Sherry Meachem came to Sgt. Cunningham with a problem concerning her then husband, William Meachem, who at that time was in the Army serving in Vietnam. She was concerned over the fact that her husband had become a heavy user of marijuana, and apparently intended to smuggle a large quantity of the drug back with him when he returned to Juneau.

Because of her concern with her husband's use of the drug in Vietnam and his apparent plans to continue his involvement with the drug traffic upon his return, she agreed to aid the police in apprehending certain of her husband's friends (specifically George Katzeek and James Hastings) whom she believed to be involved with the marijuana traffic in Juneau. She undertook to "make a buy" for the police, which she did. Although Arthur Fresneda was not one of the persons mentioned in Sherry Meachem's original conversation with Sgt. Cunningham, he did become involved in the subsequent sale, thus precipitating the case at bar.

Mrs. Meachem approached James Hastings to see if there was any way that she could buy some marijuana from him or from George Katzeek. She was informed by Hastings that he did not have any marijuana at that time and that he was not as-

1. The witness remarried after the first trial and will be referred to as Sherry Meachem.

sociating any further with George Katzeek, but that he expected a shipment of marijuana in the future. On December 3, 1967, Hastings, together with Fresneda, knocked on the door of the Meachem apartment at the Gold Lodge. At that time there were present three other people besides Mrs. Meachem: Rodney Pieren, Marcia Sims, and another person who is unidentified in the record. At that time, arrangements were made for Mrs. Meachem to meet with Hastings and Fresneda at the bowling alley at approximately 7:00 p. m. that evening.

Mrs. Meachem immediately telephoned Sgt. Cunningham of the Juneau Police Department, informed him of the arrangements and obtained from him money to make the purchase. She went to the bowling alley at approximately 7:00 p. m. and was present there when Hastings and Fresneda arrived. They proceeded outside the bowling alley where Mrs. Meachem received a small pill box full of marijuana and made payment of $10 to Hastings. The package was handed by Fresneda to Hastings, who handed it to Mrs. Meachem.

Mrs. Meachem then immediately took the package to Sgt. Cunningham at the Capitol Theater as had previously been agreed upon.

James Hastings testified in substantial conformity to the events noted by Sherry Meachem. He testified of going to the Meachem apartment with Fresneda and confirmed the conversation about arrangements for the sale at a later time in the day. Hastings testified that he was also present at the actual sale near the bowling alley and observed the exchange of money and the marijuana between Mrs. Meachem and appellant.

Rodney Pieren testified at the first trial but was absent at the second trial and his testimony was replayed in this case. Basically, Pieren testified as to the events at the apartment on December 3, 1967, including identification of the voices of Fresneda and Hastings. Pieren further confirmed the content of the conversation as testified to by Mrs. Meachem and Hastings.

Sgt. Cunningham and Police Chief Patrick Wellington of the Juneau Police Department testified as to their activities on the day in question and Sgt. Cunningham confirmed the activities and statements by Sherry Meachem about this particular matter, as well as the arrangements that were made.

The defendant did not take the stand himself, nor did he present evidence in his defense in this particular case, except concerning the reputation in the community for veracity of Sherry Meachem and Rodney Pieren. A verdict of guilty was returned against him as to the two counts remaining after the dismissal of the second count by the State of Alaska.

In this appeal to the Supreme Court, appellant has raised three specific issues as error: (1) The trial court erred in failing to give an informer instruction concerning the testimony of Sherry Meachem; (2) The trial court erred in admitting into evidence the testimony of Rodney Pieren; and (3) The trial court erred in refusing to allow appellant to waive cross-examination of the witness Pieren at the second trial by excluding that portion of the tape of Pieren's cross-examination which was taken at the first trial. Each of these matters will be considered in turn.

## A. INFORMER INSTRUCTION

At the end of the trial, the appellant requested the following instruction regarding the testimony of Sherry Meachem:

The testimony of an informer, or any witness whose self-interest or attitude is shown to be such as might tend to prompt testimony unfavorable to the accused, should always be considered with caution and weighed with great care.

The trial court refused to give the requested instruction for the reason that the general instruction as to the credibility of a witness would be more appropriate under the facts and circumstances of this particular case.

The "informer instruction" is relatively new to the law. The one proposed by ap-

pellant's counsel in the instant case is the one normally used by the federal courts, and is taken verbatim from Mathes & Devitt, Federal Jury Practice and Instructions § 9.02 (1965).

The first federal case to require an informer instruction seems to have been Fletcher v. United States.[2] In commenting upon the use of a paid informer to establish a narcotics violation, the court stated:

> In the circumstances we have detailed we think it apparent that appellant was entitled of right to have the jury cautioned. Granting that the credibility of the testimony of a paid informer is for the jury to decide, it nevertheless follows that where the entire case depends upon his testimony, the jury should be instructed to scrutinize it closely for the purpose of determining whether it is colored in such a way as to place guilt upon a defendant in furtherance of the witness's own interest. Here, admittedly, the usefulness of the witness—and for which he received payment from the agent—depended wholly upon his ability to make out a case. No other motive than his own advantage impelled in all that he did. * * * The rule in this jurisdiction for a quarter of a century has been to require that a jury be warned in the case of evidence given by a detective engaged in the business of spying for hire. The duty is more impelling where, as here, there is not a jot or tittle of other evidence and the criminal record of the witness is shown.[3]

The District of Columbia cases cited in support of the 25-year history referred to in the opinion did not support the court's statement. Two of them were not informer but *accomplice* cases;[4] the other one actually involved an "informer" or "detective spying for hire" in a divorce case.[5]

The general use of informer instructions in the federal courts seems to date from Justice Jackson's dictum in On Lee v. United States:[6]

> The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions.[7]

This passage is usually cited in support of the requirement of such instructions.[8]

The original basis for the informer instructions seems to have been the fact that an informer is normally an interested witness; he is usually either paid, or hoping for lenient treatment of his own crimes, or both. In this connection, it is interesting to note that the original version of the above-cited Mathes & Devitt instruction read as follows:

### INTERESTED WITNESS

> All evidence of a witness whose self-interest or attitude is shown to be such as might tend to prompt testimony unfavorable to the accused, should be considered with caution and weighed with great care.[9]

It was only with the publication of Mathes & Devitt in 1965 that the word "informer"

---

2. 81 U.S.App.D.C. 306, 158 F.2d 321 (1946).

3. *Id.* at 322.

4. Egan v. United States, 52 App.D.C. 384, 287 F. 958 (1923); Freed v. United States, 49 App.D.C. 392, 266 F. 1012 (1920).

5. Allen v. Allen, 52 App.D.C. 228, 285 F. 962 (1923).

6. 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

7. *Id.* at 757, 72 S.Ct. at 973–974, 96 L.Ed. at 1277.

8. *E. g.*, United States v. Griffin, 382 F.2d 823, 827–829 (6th Cir. 1967).

9. W. Mathes, Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 68 (1961) (citing On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), and Fletcher v. United States, 81 U.S.App.D.C. 306, 158 F.2d 321 (1946)).

began to be specifically mentioned.[10] The latest published version of the same instruction reads as follows:

> The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against the defendant.[11]

A review of state authorities does not reveal any case law paralleling the development of federal law on this particular instruction. The reason behind the failure of state courts to give such instructions appears to be based on the belief that the credibility of all witnesses should be judged by the same standard wherever possible, except in those few cases where either a long tradition of judicial decision or separate legislative enactment recognizes the possible unreliability of certain witnesses.[12]

The appellant urges that the requirement of a similar instruction in cases where testimony of an accomplice is presented provides a clear analogy to the case at bar. However, the rule in regard to accomplice testimony in this state[13] has a statutory background as does the rule in Oregon[14] from which the Alaska statute was taken.

While the federal courts do not have an absolute statutory prohibition concerning conviction on the uncorroborated testimony of an accomplice, they do require cautionary instructions on credibility of accomplices, as noted in § 12.04 of Devitt & Blackmar, Federal Jury Practice and Instructions (1970):

> An accomplice is one who unites with another person in the commission of a crime, voluntarily and with common intent. An accomplice does not become incompetent as a witness because of participation in the crime charged. On the contrary, the testimony of an accomplice alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilty, even though not corroborated or supported by other evidence. However, the jury should keep in mind that such testimony is always to be received with caution and weighed with great care.

> You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that unsupported testimony beyond a reasonable doubt.[15]

The background of the instruction in each case is a recognition that the testimony of accomplices and certain informers is subject to distrust because of their interest in the outcome of the proceedings. This interest may cause them to weight their testimony and the jury should be informed thereof and should be instructed to use a different standard in viewing their testimony than that applied to the testimony of other witnesses.

█ It would appear appropriate because of the known unreliability of certain types of accomplice and informer testimony to adopt in Alaska the requirement that the jury be instructed henceforth from the date of this opinion that the testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness.

█ However, because the law recognizes that some witnesses, such as the accomplice and interested informer, should in some circumstances be the subject of

---

10. W. Mathes & E. Devitt, Federal Jury Practice and Instructions § 9.02 (1965).

11. E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 12.02 (1970).

12. *Cf.* Battese v. State, 425 P.2d 606, 609 (Alaska 1967).

13. AS 12.45.020.

14. Ore.Comp.Laws Ann. § 2–1001(4) (1940).

15. For a review of the history of the "accomplice" instruction in the federal courts, *see* McMillen v. United States, 386 F.2d 29 (1st Cir. 1967), cert. denied 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968).

cautionary instructions does not mean that every witness who comes forward to aid in the apprehension of those accused of criminal activity should be singled out for such treatment.

It would be a sad commentary on our society to say that when police officers and public-spirited citizens are called to testify in court under oath in criminal cases, their testimony must be viewed with suspicion. This would be tantamount to saying all such witnesses are inherently untrustworthy.[16] At a time when the fullest participation by all segments of society is necessary for the survival of our system of government, we would be paradoxically condemning such participation. This we decline to do.[17]

An example of this situation is the case at bar. Sherry Meachem was not a professional informer. She was not paid; the only money provided her by the police was that with which she actually bought the drug. She was under no criminal charges, nor had she ever used marijuana herself. While her concern over her husband's use of drugs might motivate her to attempt to aid in the apprehension and conviction of those who had either supplied him in the past or might supply him in the future, it would not motivate her to lie, or to try to convict the wrong man.

 While the credibility of Sherry Meachem was a matter for the jury to determine under the facts and the instructions of the court,[18]—as was extensively

argued by counsel for appellant in closing argument—there appears to be no reason to single out her testimony for a judicial admonition for caution. If one had been given it undoubtedly would have had a significant effect on the jury. Such an instruction would undoubtedly chill future aid to be given by private citizens if the reward for their concern was an instruction by the court that they should be distrusted. It was thus not error for the trial court to refuse to give the requested informer instruction under the facts of this case.

## B. USE OF TESTIMONY FROM FORMER TRIAL

Appellant contends that the state did not show sufficient "due diligence" in its attempt to find and obtain the presence of the witness Pieren, so that his former testimony should not have been admitted at all. The effort to find Pieren which is disclosed by the testimony of the prosecution's witnesses seems less than diligent. Although the District Attorney's secretary made a few limited efforts to locate Pieren earlier in the month before the trial, no systematic search was begun until about the 22nd of December, 1969, with trial scheduled for the 29th. At that time, the chief of the Juneau police checked police records there and in Anchorage for any trace of Pieren, and found nothing. No subpoena for Pieren was ever issued.

Michael Biggs, court attache, was assigned to look for Pieren on the 27th.

---

16. Bush v. United States, 126 U.S.App. D.C. 174, 375 F.2d 602, 604 (1967).

17. This does not mean the witness cannot be subjected to rigorous cross-examination and corresponding closing argument as to the credibility, as was done in this case.

18. Instruction No. 18 provided in part as follows:

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. A witness is presumed to speak the truth. But this presumption may be outweighed by the manner in which the witness testifies, by the character of the testimony given, or by contradictory evidence.

You should carefully scrutinize the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness's intelligence, motive and state of mind, and demeanor and manner while on the stand, and his or her character as shown by the evidence. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence.

After a few hours on the telephone talking to various people, Biggs turned up several persons who said that they believed that Pieren was then in the Army. He made an attempt to verify this through the Adjutant General's office, Department of Military Affairs, but received no answer and apparently did not follow up on his request.

On the date of the trial Mrs. Jones, the prosecutor's secretary, was informed by Major Holmeson of the Army National Guard in Anchorage that Pieren had enlisted on May 16, 1969, and had been sent to Ft. Lewis, Washington, for his eight weeks basic training. Major Holmeson had no knowledge of where he had gone from there, but suggested that he might be in Vietnam. Thus, Pieren's actual physical location was never determined prior to trial. The trial court, apparently assuming that the man was probably in Vietnam, ruled that sufficient diligence had been shown and admitted the former testimony.

In McBride v. State,[19] this court held that, although former testimony is inadmissible in such situations unless the state has exercised due diligence in attempting to find the witness, "[t]he question of diligence or lack of it on the part of the state in attempting to find the witness is in the first instance a question of fact for the trial judge to decide, and we shall reverse his decision only if there has been a clear abuse of discretion."[20]

The cases decided in other states under this rule seem to indicate that the state is held to a higher standard where it reports that it cannot find the witness, as compared with situations in which the state locates him, but he is found outside its jurisdiction. A typical statement of the standard in the "can't find" cases is found in People v. Redston:[21]

> The word "diligence" connotes perservering application, untiring efforts in good earnest. There must be evidence of a substantial character to support the conclusion of due diligence. [What is required is] a thorough, painstaking and systematic attempt to locate the witnesses.

In the cases in which the witness is located but is outside the state, the traditional rule required no evidence of an attempt to bring him back.[22] It was held in a state which has enacted the Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Proceedings that the prosecution need not make use of the Act but could simply show that the witness was outside the state's jurisdiction.[23]

However, this is no longer the law. In Barber v. Page,[24] the United States Supreme Court held that, where a witness was incarcerated in a federal prison outside the state, the state could not use his preliminary hearing testimony at the petitioner's trial without making a good faith effort through the federal authorities to bring him back to testify.

In this case we adopt the standards of due diligence announced in Barber v. Page, and we modify our holding in McBride v. State accordingly by finding that these standards must be applied to the facts of the case at bar.[25]

19. 368 P.2d 925, 927 (Alaska 1962).

20. Compare this with the requirement of diligence in civil cases as set forth in Otis Elevator Co. v. McLaney, 406 P.2d 7, 10–11 (Alaska 1965).

21. 139 Cal.App.2d 485, 293 P.2d 880, 886 (1956).

22. *See, e. g.,* People v. Green, 152 Cal.App. 2d 886, 313 P.2d 955, 957–958 (1957); People v. Horace, 127 Cal.App.2d 366, 273 P.2d 923, 925 (1954).

23. State v. Martin, 73 Wash.2d 616, 440 P.2d 429, 434–435 (1968).

24. 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

25. While we recognize that there is a difference between testimony elicited at preliminary hearings and testimony introduced at trial in terms of completeness and depth of cross-examination, we find that this difference should not be the basis for the requirement of a different standard of due diligence in each case.

A review of the facts herein makes it clear that the efforts to locate and return [26] Pieren were not sufficient to be designated as "due diligence" and that the trial court was in error in holding that the state had met the burden required.

We, however, hold that the error in admission of the Pieren testimony was harmless error for we conclude that the jury was not substantially influenced or swayed in its verdict by the introduction of the testimony. Love v. State, 457 P.2d 622, 631 (Alaska 1970).

The testimony of Sherry Meachem and James Hastings stands unopposed as to the sale of marijuana to her by appellant. Sherry Meachem testified that Arthur Fresneda came to her apartment with Hastings to make arrangements for the sale. She stated that immediately thereafter she phoned Sgt. Cunningham, who gave her money to make the purchase and gave her instructions concerning delivery of the marijuana to him after the sale.

Sherry Meachem testified she consummated the sale transaction with Fresneda for $10 near the local bowling alley some hours later in the presence of James Hastings, and immediately delivered the marijuana to Sgt. Cunningham.

James Hastings confirmed the time sequence as to the events of the day. He testified that he was present when the arrangements for the sale were made and that later in the day he also observed the actual exchange of the marijuana for money between Sherry Meachem and Fresneda.

Sgt. Cunningham testified as to his part in the transaction and generally confirmed the time sequence and instructions he gave to Sherry Meachem.

The defendant elected, as was his right, not to take the stand, but he did submit the testimony of four witnesses [27] who testified that the reputation of Pieren and Sherry Meachem for truth and veracity in the community was bad.

While the efforts of the state to locate a missing witness can logically be judged in light of the advance knowledge it has of the date of trial, we find it inappropriate to encourage any but the best efforts to locate such witnesses in view of the qualitative differences between live and recorded testimony. Compare the following federal cases:

In Evans v. Dutton, 400 F.2d 826, 830 (5th Cir. 1968), rev'd on other grounds, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) there is dictum to the effect that Barber held inadmissible testimony taken at a prior trial. This is probably a mistake on the part of the court. In a few federal cases it has been held that testimony taken at a prior trial was admissible under Barber standards. Mason v. United States, 408 F.2d 903, 906 (10th Cir. 1969); O'Connor v. United States, 137 U.S.App.D.C. 76, 420 F.2d 644 (1969). In Lyon v. United States, 413 F.2d 186, 187–189 (5th Cir. 1969), it was held that, in order to make use of testimony obtained at a prior trial (mistrial) the government would have had to show a good faith effort to obtain the missing witness under Barber, except for the fact that defense counsel specifically refused to contest the point at the second trial. In

the case of United States v. Mobley, 421 F.2d 345 (5th Cir. 1970), the witness, although produced by the state at the second trial, claimed his Fifth Amendment privilege and refused to testify. The court held that Barber did not prevent the use of his former testimony. In Britton v. Maryland, 298 F.Supp. 641 (D.Md.1969), the court ruled that Barber precluded the use of testimony from a former trial where no effort had been made by the State of Maryland to retrieve the missing witness from Ft. Sill, Oklahoma, where he was stationed in the Army. The court, however, was careful to point out that the testimony of the missing witness, who at the time of the first trial had been only 15 years old, was the only evidence tending to connect Britton with the crime, and that therefore his demeanor and credibility were of extreme importance.

26. United States Army Reg. 27–45 provides a method for obtaining the return of Army personnel to testify in civil and criminal cases.

27. The testimony of two of these witnesses, Oliver Marshall and Denny Marchant, was ordered stricken by the trial court after they testified.

While the argument is advanced that any testimony which supported any statement made by Sherry Meachem would affect the outcome of the trial, this is far too restrictive a view of the harmful error doctrine. It appears unlikely that testimony confirming the conversations and arrangements made several hours prior to the sale would substantially affect the decision of the jury as to whether the appellant was guilty of the sale in view of the direct testimony in this case concerning both such arrangements and the actual sale.

■ Our decision that introduction of the testimony of Pieren was at most harmless error makes it unnecessary to consider the final point urged by appellant that the trial court improperly replayed the cross-examination of Pieren at the second trial. Since the entire testimony was at most harmless error, the admission of the cross-examination was also harmless error.[28]

The judgment and conviction of the Superior Court is hereby affirmed.

28. It is universally accepted in the common law that a party "against whom a part of an utterance has been put in, may, in his turn, complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." VII J. Wigmore, Evidence, n. 26, § 2113 at 523. It would appear the converse would also be true.