Calvin DUNBAR, Appellant,

v.

STATE of Alaska, Appellee.

No. 7049.

Court of Appeals of Alaska.

March 2, 1984.

Rich Zahniser, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Peter A. Michalski, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Calvin Dunbar was convicted by a jury of two counts of first-degree robbery. AS 11.41.500(a)(1). Superior Court Judge Ralph E. Moody sentenced Dunbar to serve concurrent ten-year presumptive terms. On appeal, Dunbar contends that illegally seized evidence was used against him at trial, that trial testimony concerning eyewitness identifications was based on an impermissibly suggestive photographic lineup, that a videotaped deposition of a defense expert was incorrectly excluded, and that his motion to limit impeachment of an alibi witness was erroneously denied. We affirm.

## FACTS

Dunbar's convictions stem from a robbery committed at a Taco John's restaurant in Anchorage. At approximately 10:15 p.m. on January 8, 1982, a customer entered the restaurant, examined the menu board, and ordered a taco. Two employees, Ron Carpenter and Roland DeFrance were working behind the counter at the time. After a few minutes, the customer returned to the counter and requested change for a dollar bill. When the cash register was opened, the customer pulled out a revolver and grabbed money from the register. He then fled through the front door of the restaurant. Carpenter and DeFrance did not move during the robbery because they saw the revolver.

Police were summoned to Taco John's and arrived soon after the robbery had occurred. Carpenter and DeFrance described the robber as a black male, about twenty-five or twenty-six years of age, with a medium build—six feet, two inches or six feet, three inches in height and approximately 180 pounds. According to Carpenter and DeFrance, the robber had small clumps of facial hair on the sides of his neck and wore a light brown, knee-length overcoat, a black or dark blue stocking cap, gloves, and a purple and beige turtleneck sweater, which had a zipper in front with a brass-colored ring. Carpenter further reported seeing a green Cadillac with a black top in the alley behind Taco John's immediately before the robber entered the restaurant. Carpenter described the driver of the Cadillac as a black male. Descriptions of the robber and the Cadillac were broadcast over the police radio shortly after the robbery was reported.

Two hours after the robbery, Anchorage police officers on routine patrol spotted a black and green Cadillac occupied by two black males; after a chase that lasted seven or eight blocks, the officers stopped the Cadillac and ordered the driver and his passenger out of the car. The driver was identified as Ernest Williams; Dunbar was the passenger. Dunbar was wearing a sweater similar to the one described by Carpenter and DeFrance, and he generally fit the description of the robber. Officers conducted a brief patdown search of Dunbar and Williams and, after a short interview, directed them to get back into the Cadillac until the investigation at the scene was completed. Before Dunbar and Williams reentered the Cadillac, a police officer briefly searched the interior of the car for weapons. The officer opened the glove compartment, which was unlocked, and found a loaded revolver that matched the description of the gun used in the robbery. Dunbar and Williams were then arrested for the robbery.

Later that night, police showed Carpenter and DeFrance photographic lineups that included pictures of Dunbar and Williams.

Both identified Dunbar as the robber. The next day, Leah Alden informed police that she had seen a large car, followed by a police car, speed past her house at about midnight on the previous night. As the car passed, Alden saw something thrown out of the passenger side. Alden later retrieved a leather coat and a woolen hat from the roadway in front of her house; she turned these items over to the police. Alden's house was located along the route taken by Williams and Dunbar when they were being pursued by the police. Carpenter was able to identify the coat and hat as similar to the ones worn by the Taco John's robber.

Dunbar was subsequently indicted for two counts of first-degree robbery.

### SEIZURE OF THE GUN

Dunbar first contends that the gun found by police in the glove compartment of the Cadillac was illegally seized and should have been suppressed from evidence at trial. Dunbar concedes that the investigative stop of the Cadillac was justified. He nevertheless argues that, in searching the glove compartment of the car, the officer exceeded the permissible limits of the stop. We disagree.

■ Police officers who make a legitimate investigative stop of an automobile may conduct a limited search for weapons, for their own protection, if they have a reasonable suspicion that occupants of the automobile are armed. The proper scope of such a search is co-extensive with the permissible limits of a search incident to a lawful arrest. *Uptegraft v. State,* 621 P.2d 5, 9 n. 7 (Alaska 1980). Since the unlocked glove compartment of the Cadillac was within easy reach of Dunbar and Williams when they were lawfully detained, and since the officers who made the stop had good cause to believe that Dunbar and Williams might be armed, a check of the glove compartment for weapons was justified.

■ It is not significant that Dunbar and Williams had been removed from the Cadillac when the glove compartment was opened. The limits of a search incident to an arrest are determined by the location of the defendant at the time of the arrest. *Hinkel v. Anchorage,* 618 P.2d 1069, 1071 (Alaska 1980), *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1744, 68 L.Ed.2d 228 (1981); *Dunn v. State,* 653 P.2d 1071, 1080 (Alaska App.1982). We believe the same rule must apply to weapons searches conducted during an investigative stop, since the scope of such searches is the same as the scope of weapons searches incident to arrest. Thus, a cursory check of the Cadillac's glove compartment for weapons was permissible even though Dunbar and Williams did not have immediate access to the car when the search actually occurred. *See, e.g., Michigan v. Long,* —— U.S. ——, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

This result seems particularly suitable in the present case because Dunbar and Williams were about to reenter the car at the time the glove compartment was checked. Dunbar argues that the police ordered him to return to the Cadillac as a pretext to search the glove compartment. He insists that he and Williams could easily have been detained outside the car until the on-the-scene investigation was completed. However, even if Dunbar and Williams had been detained outside the Cadillac during the on-the-scene investigation, they would have eventually returned to the car when investigation was completed, since officers at the scene did not think they had probable cause for arrest until the revolver was discovered. Officers conducting the stop had a strong and reasonable suspicion that Dunbar and Williams were in fact the perpetrators of the robbery. They similarly had good reason to believe that a gun might be found in the Cadillac. Because it appeared that Dunbar and Williams would soon be permitted to return to the Cadillac, the officers at the scene would have had good reason to take the precaution of checking for weapons, even if it was unnecessary to require Williams and Dunbar to

be seated in the car pending completion of the investigation.

## SUGGESTIVE PHOTO LINEUP

■ Dunbar next asserts that a photographic lineup shown by police to Carpenter and DeFrance was impermissibly suggestive. Specifically, Dunbar claims that Carpenter and DeFrance should not have been informed that a photograph of the suspected robber was included in the lineup. This argument is unpersuasive, since the likelihood that the suspect would be included in the photo lineup was a fact that both witnesses could easily have surmised without specifically being told. *See, e.g., Howe v. State*, 611 P.2d 16, 17–19 (Alaska 1980) (one-man showup not unduly suggestive when victim of crime heard on the police radio that a suspect had been apprehended); *Holden v. State*, 602 P.2d 452, 457 (Alaska 1979) (identification admissible where police officer stated, "I have a wild hunch," as he handed a victim two photographs of the same suspect); *Buchanan v. State*, 561 P.2d 1197, 1204 (Alaska 1977) (lineup not unduly suggestive when nine-year-old victim was told, "see if you can find the person that attacked you," when shown a photo lineup).

■ Dunbar also claims that the photo lineup was suggestive because his photograph was the only one depicting a person with facial hair similar to that reported by Carpenter and DeFrance. We have inspected the photographic lineup, which is part of the record on appeal. The traces of facial hair depicted in Dunbar's photograph are faint and by no means obvious; they do not render Dunbar's appearance distinctive as compared to the appearance of other persons included in the lineup. We thus find no merit to Dunbar's claim.

Dunbar also complains that he was the only person in the photographic lineup who

was wearing a sweater that had a zipper with a brass-colored ring. However, items of clothing worn by a suspect have previously been found to be an appropriate basis for identification. *See Vessell v. State*, 624 P.2d 275 (Alaska 1981). Even assuming the distinctive nature of the sweater worn by Dunbar was suggestive, the identifications made by Carpenter and DeFrance appear to be reliable when all of the surrounding circumstances are considered. Both Carpenter and DeFrance had ample time to view the robber while he was in the restaurant; they both gave fairly detailed descriptions; both were highly confident in their identifications; and the identifications were made within hours of the offense. These strong indicia of reliability must be balanced against the suggestiveness attributable to the clothing worn by Dunbar in the photographic lineup. *See, e.g., Walker v. State*, 652 P.2d 88, 95 (Alaska 1982); *Blue v. State*, 558 P.2d 636, 643 (Alaska 1977); *Noble v. State*, 552 P.2d 142, 146 (Alaska 1976). On balance, we conclude that the lineup procedure did not deprive Dunbar of due process. *See Viveros v. State*, 606 P.2d 790, 792 (Alaska 1980); *Holden v. State*, 602 P.2d 452, 456 (Alaska 1979); *Cox v. State*, 575 P.2d 297, 304 (Alaska 1978); *Tookak v. State*, 648 P.2d 1018, 1022 (Alaska App.1982).[1]

## DEPOSITION OF EXPERT WITNESS

■ Dunbar's trial was originally scheduled to begin on April 26, 1982. Dunbar intended to call as a defense witness Professor Elizabeth Loftus, an expert on eyewitness identification. As Dunbar's trial date approached, however, his case was placed on trailing status, and it became apparent that the trial would not begin as scheduled. Dunbar sought and obtained leave to take a videotape deposition of Professor Loftus in order to preserve her testimony. In her deposition, Loftus testified

1. Dunbar also includes as a point on appeal the claim that the in-court identification made at his trial by DeFrance was unduly suggestive. Since Dunbar has failed to brief this issue, we deem it abandoned except to the extent that the issue coincides with Dunbar's challenge to the

validity of the prior photographic lineup. *See Kristich v. State*, 550 P.2d 796, 799 (Alaska 1976). Our holding that the photographic lineup was not impermissibly suggestive thus disposes of Dunbar's claim with respect to the in-court identification.

concerning the reliability of eyewitness identifications; she also discussed her availability to testify at a future time. Loftus indicated that she was required to teach at the University of Washington in Seattle two days a week. She also stated that she had already made commitments through the month of May for most of the days when she was not scheduled to teach. Several of Loftus's commitments involved court appearances, but most were speaking engagements at conferences and seminars. Loftus said that she was not under subpoena in any case in which she was scheduled to testify, and she stated that she would not disregard a subpoena to testify in Dunbar's case. Loftus also said that there was at least one day, May 28, on which she had made no commitments. No ruling on the admissibility of Loftus's video deposition was made at the time it was taken.

Dunbar's trial eventually commenced on May 25, 1982. The state completed presentation of its case-in-chief on the afternoon of May 26. Dunbar then moved to admit Loftus's video deposition, alleging that it was admissible under Criminal Rule 15 because Loftus was unavailable to testify in person. To support his claim of unavailability, Dunbar relied exclusively on the statements made by Loftus in her deposition. Judge Moody denied the motion to admit Loftus's deposition, ruling that Dunbar had not established that Loftus was unavailable. Dunbar contends this ruling was erroneous.

Under Criminal Rule 15(d), a deposition may be admitted in a criminal case "by stipulation of the parties or if the witness is unavailable ...." Criminal Rule 15(e) provides:

A witness is "unavailable" when he is:

. . . . .

(4) [a]bsent from the hearing and beyond the jurisdiction of the court to compel appearance and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance.

The unavailability requirement of Criminal Rule 15 is reflective of the preference for live testimony in criminal cases. *See, e.g., Fresneda v. State*, 483 P.2d 1011, 1017–18 n. 25 (Alaska 1971).

Professor Loftus, in her deposition, expressly indicated that she would honor a subpoena to testify. Even if she had not, her whereabouts were apparently known, and there is no reason to believe that her appearance could not have been secured. *See* AS 12.50.010–.080 (Uniform Act to Secure Attendance in Criminal Proceedings). Dunbar made no attempt to subpoena Loftus, although he could have readily done so. Despite Loftus's deposition testimony indicating that she might be available to testify on May 28—only two days after the state ultimately rested its case—Dunbar did not move for a continuance to obtain her testimony, nor did he make any showing that Loftus was no longer available on that date. In fact, even though Loftus had testified that her schedule for the month of May could change due to cancellations or rescheduling of various engagements, Dunbar apparently made no effort to determine whether Loftus was actually available for trial.

Under these circumstances, we conclude that Dunbar has failed to demonstrate either that Loftus was beyond the jurisdiction of the court or that he exercised due diligence in attempting to secure her testimony. Loftus was therefore not unavailable within the meaning of Criminal Rule 15(e)(4). *See Stores v. State*, 625 P.2d 820, 826 (Alaska 1980). We thus hold that Judge Moody did not err in denying Dunbar's motion to admit the video deposition.

## IMPEACHMENT OF TILLMAN BRADLEY

After the state completed its case-in-chief, Dunbar informed the court that he intended to call Tillman Bradley (also known as Kenneth Mack) as an alibi witness. Dunbar requested a protective order barring the prosecution from impeaching Bradley by disclosing that he was incarcerated pending trial on a robbery charge. After considering argument on the motion

and hearing an offer of proof, Judge Moody ruled that the state would be allowed, through cross-examination, to establish that Bradley and Dunbar were housed together in the same correctional facility, that they had contact with one another there, and that Bradley had a charge of robbery pending against him.

However, Judge Moody specified that the state would not be permitted to inquire into the issue of Bradley's guilt. The judge further indicated that he would instruct the jury that Bradley's charge was unrelated to Dunbar's case and that the issue of Bradley's guilt or innocence was irrelevant. Finally, Judge Moody informed Dunbar that he would consider and rule on specific defense objections to any questions the state might ask in cross-examining Bradley. In light of Judge Moody's ruling, Dunbar elected not to call Bradley as a witness. He now contends that denial of the protective order was error.[2]

At the outset, we note that evidence establishing that Bradley was incarcerated with Dunbar and that he faced criminal charges was, at a minimum, relevant to the issue of Bradley's credibility as an alibi witness. This evidence would have tended to show that Bradley and Dunbar had ample opportunity to fabricate Bradley's alibi testimony. Assuming the probative value of this evidence on the issue of recent fabrication outweighed its potential for prejudice, the evidence was admissible under Alaska Rule of Evidence 404(b).[3]

More significantly, the challenged evidence would have been relevant to show possible bias on Bradley's part. Because Bradley was incarcerated and awaiting trial on a criminal charge, he might well have developed considerable hostility toward law enforcement officials and the criminal justice system, regardless of his guilt or innocence of the crime with which he was charged. In addition, Bradley might well have been inclined to sympathize with Dunbar, and strong feelings of affinity could have developed between them. Thus, Bradley might have been predisposed to assist Dunbar. Moreover, because Bradley was already incarcerated, it is possible that he felt he had little to lose in attempting to aid Dunbar. Assuming, once again, that the probative value of this evidence outweighed its potential for prejudice, the evidence was admissible under Alaska Rule of Evidence 613.[4]

The crucial question is thus whether the probative value of the evidence concerning Bradley's incarceration outweighed its potential for prejudice. This evidence would have been admissible only if its tendency to show bias and opportunity for recent fabrication was sufficiently strong to outweigh the possibility that Bradley might be disbelieved merely because he was incarcerated. The evidence might also have prejudiced Dunbar by creating the impression that he associated with persons involved in criminal misconduct similar to that with which he was charged. *See* Alaska Rule of Evidence 403.[5]

**2.** Dunbar primarily relies on Evidence Rule 609 to support his argument. However, Evidence Rule 609 deals exclusively with the admissibility of prior convictions as character evidence to show truthfulness. Here, the state did not intend to question Bradley about prior convictions and did not seek to prove that he had a poor character for truthfulness. Although Rule 609 may be marginally relevant to an evaluation of the possible prejudice that may result from admission of evidence of pending charges, it is by no means controlling.

**3.** A.R.E. 404(b) provides:
 *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity there-

with. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**4.** A.R.E. 613 provides, in relevant part:
 *Prior Inconsistent Statements—Bias and Interest of Witness.*
 (a) *General Rule.* Prior statements of a witness inconsistent with his testimony at a trial, hearing or deposition, and evidence of bias or interest on the part of a witness are admissible for the purpose of impeaching the credibility of a witness.

**5.** A.R.E. 403 provides, in relevant part:
 *Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.*

Where evidence of prior misconduct by a defense witness is only remotely relevant to show bias, motive, or opportunity for fabrication, it has commonly been held inadmissible. *See, e.g., Lupro v. State,* 603 P.2d 468, 477–79 (Alaska 1979); *United States v. Maynard,* 476 F.2d 1170, 1173–75 (D.C.Cir.1973). However, where a reasonable inference of bias or recent fabrication may be drawn, courts have permitted impeachment of defense witnesses by evidence of pending criminal charges or other specific acts of prior misconduct. *See, e.g., McKay v. State,* 489 P.2d 145, 148–49 (Alaska 1971); *United States v. Rios Ruiz,* 579 F.2d 670, 672–74 (1st Cir.1978); *United States v. Hodnett,* 537 F.2d 828, 829 (5th Cir.1976); *United States v. Robinson,* 530 F.2d 1076, 1079–82 (D.C.Cir.1976); *State v. Moynahan,* 325 A.2d 199, 219 (Conn.), *cert. denied,* 414 U.S. 976, 94 S.Ct. 291, 38 L.Ed.2d 219 (1973).

Although we think the issue in this case is a close one, we believe that Judge Moody's refusal to preclude evidence of Bradley's incarceration did not amount to an abuse of discretion. On the one hand, the probative value of this evidence on the issues of bias and opportunity for recent fabrication is reasonably strong; certainly it cannot be classified as speculative or remote.[6] On the other hand, the potential for prejudice posed by this evidence was mitigated by Judge Moody's restriction against any questions concerning the circumstances of Bradley's offense or the issue of Bradley's guilt. Furthermore, Judge Moody was prepared to give an appropriate instruction limiting the purpose

for which the jury could consider the evidence of Bradley's incarceration. Accordingly, Judge Moody could reasonably have found that the prejudicial impact of the evidence concerning Bradley did not outweigh its probative value for the purpose of impeachment.

In reaching this conclusion, we are particularly influenced by the strong preference given by the Alaska Supreme Court to admission of evidence tending to show bias. In *Hutchings v. State,* 518 P.2d 767 (Alaska 1974), the court held that evidence of bias should ordinarily be admitted for impeachment purposes:

> We believe that an articulation of the standards used to assess the relevancy and materiality of evidence offered to show bias is necessary. To be of sufficient relevance for admission, testimony, documents or other evidence must have some tendency in reason to establish a proposition material to the case. The offered evidence need not, of itself, prove the fact it purports to aid in determining; it need only "render the desired inference *more probable than it would be without the evidence....*" When evidence is offered to impeach a witness by showing bias, the same rule applies. There are no special rules of "proper impeachment" for bias. The credibility of witnesses is always a material issue, so the only question of materiality or relevance when evidence is offered to impeach for bias is whether the evidence tends in reason to demonstrate the existence of some fact, state of mind or condi-

---

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**6.** We recognize, however, that Judge Moody's decision to allow the state to establish that Bradley was charged with the offense of robbery is highly questionable. Evidence relating to the specific charge would have been only slightly probative, at best, on the issues of bias and recent fabrication. The added prejudice of the evidence, on the other hand, would have been substantial. *Cf. Frankson v. State,* 645 P.2d 225,

228 (Alaska App.1982). We nevertheless conclude that any error in allowing proof of the specific charge against Bradley was harmless. The extent of prejudice to Dunbar would have been diminished by Judge Moody's willingness to inform the jury that Bradley's charge was unrelated to Dunbar's and that the question of Bradley's innocence or guilt was irrelevant. Furthermore, there is nothing in the record to indicate that Dunbar would have elected to call Bradley as a witness if Judge Moody had only permitted evidence that Bradley and Dunbar were incarcerated together, without allowing proof of the specific crime with which Bradley was charged.

▉▉▉▉▉▉▉▉▉

tion that a reasonable person would take into account in assessing the credibility of the witness under attack. As we pointed out above, the balance must be weighed in favor of admissibility where impeachment for bias is the object.

*Id.* at 769 (footnotes omitted; emphasis in the original), *quoting* E. Cleary, *McCormick on Evidence*, § 185 at 437 (2d ed. 1972).

Although *Hutchings* dealt with a situation in which the defendant had been unduly restricted in attempts to cross-examine a police informant concerning the informant's prior discharge from the police department, the court unequivocally stated that admissibility of evidence tending to show bias cannot be limited to cases of cross-examination by the defense. The court held:

> Nor would we hold otherwise if the attempted impeachment was two-edged. Where testimony relevant to a showing of bias may aid or injure either party, each of them is entitled to introduce it into evidence; whether to do so or not is purely a matter of trial strategy.

*Id.* at 770. *See also State v. Moynahan,* 325 A.2d at 219–20.

In this case, we think it sufficiently clear that evidence showing that Dunbar and Bradley were incarcerated together in the same institution would tend "in reason to demonstrate the existence of some fact, state of mind or condition that a reasonable person would take into account in assessing the credibility of" Bradley's proposed alibi testimony. *Hutchings v. State,* 518 P.2d at 769. We therefore hold that Judge Moody's denial of Dunbar's motion for a protective order did not constitute error.

The conviction is AFFIRMED.